In the Matter of **BOSTON AND MAINE CORPORATION,** Debtor.

No. 70–250–M.

United States District Court, D. Massachusetts.

May 2, 1974.

Charles W. Mulcahy, Jr., Mulcahy & Mulcahy, Boston, Mass., for the Trustees.

Alan L. Lefkowitz, Gaston, Snow, and Ely, Bartlett, Boston, Mass., for Amoskeag Co. and Passaconaway Co.

John L. Davidson, Jr., Greenfield, Davidson & Mandelstamm, St. Louis, Mo., for Passaconaway Co.

Walter H. Mayo, III, Asst. Atty. Gen. of Mass., Boston, Mass., for the Commonwealth of Mass.

Richard Jackson, Cleveland, Ohio, for Erie Lackawanna Railroad Co.

Paul B. Galvani, Ropes & Gray, Boston, Mass., for Maine Central Railroad Co.

John T. Collins, Sherburne, Powers & Needham, Boston, Mass., for Vermont Railway Inc., and the State of Vt.

Neal Holland, Sherburne, Powers & Needham, Boston, Mass., for the MBTA.

Michael T. Haley, Asst. U. S. Atty., Washington, D. C., for the U. S. Dept. of Transp.

William P. Quinn, Strong, Barnett, Hayes & Quinn, Philadelphia, Pa., for Del. & Hudson Railway Co.

Joseph H. B. Edwards, Bingham, Dana & Gould, Boston, Mass., for First Mortgage Indenture Trustees.

## MEMORANDUM

FRANK J. MURRAY, District Judge.

On March 12, 1970 certain bondholders of the Boston and Maine Corporation (Debtor) filed a petition instituting proceedings in this court for reorganization of the railroad in accordance with Section 77 of the Bankruptcy Act (11 U.S. C. § 205). The bondholders' petition was approved, and trustees of the Debtor and its property were appointed by the court. The reorganization proceedings thus commenced are continuing. This matter came on to be heard and considered in conformance with the "120-day provision" of Section 207(b) of

the Regional Rail Reorganization Act of 1973 (Act), Pub.L.No. 93–236:

> [Section 207] (b) *Approval.*—Within 120 days after the date of enactment of this Act each United States district court . . . having jurisdiction over a railroad in reorganization shall *decide* whether the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. 205) and that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under this Act.

On January 17, 1974 the court entered an order scheduling a hearing of the questions presented in the first sentence of Section 207(b)[1] and directed the trustees of the Debtor to serve a copy thereof on

> all parties who have been permitted to intervene in these proceedings, on all parties who have intervened in the proceedings before the Interstate Commerce Commission (Finance Docket No. 26115), and on each of the governors of the states specified in Sec. 102(13) of the said Regional Rail Reorganization Act of 1973.

Pursuant to the order, written statements setting forth factual and legal issues deemed to be relevant for consideration, were filed as were supporting memoranda. On March 20 the court entered an order directing the trustees (1) to make available certain officers and employees of the Debtor for the purpose of interrogation by interested parties for discovery of matters relevant under Section 207(b), (2) to make available also all relevant documents (with certain exceptions)[2] in the trustees' possession, and (3) to permit parties to make copies of the documents at the parties' expense.

When the matters came on for hearing on March 28 the court directed that evidence on the issue whether the railroad is reorganizable on an income basis within a reasonable time under Section 77 of the Bankruptcy Act should be presented in the first instance, and, thereafter, evidence on the public interest issue. The court also announced that affidavits on the public interest issue filed not later than April 5 would be considered, and objections to the contents thereof, if supported by a statement of reasons, could be filed not later than April 12. Testimony of 18 witnesses was offered at the hearing, and 39 exhibits were received in evidence. Affidavits on the public interest question were later filed within the time allowed.

No contention was made by any party or other person that this court did not have jurisdiction under the 120-day provision of Section 207(b), except that the constitutionality of the Act has been challenged by the First Mortgage Trustees. Their counsel participated in these proceedings without waiving that challenge, and expressly reserved the rights of his clients to seek adjudication of the constitutional issues raised by them.

## I. *The question of reorganizability.*

In focusing on the question of reorganizability under Section 207(b) the court is confronted with a novel undertaking. There is no definitive plan of reorganization before the court, or, as can best be ascertained, before any other of the courts having jurisdiction over northeast railroads in reorganization or before the Interstate Commerce Commission (ICC) at the time of the passage of the Act. It would therefore appear that Congress must have intended this court to decide whether under the circumstances known to the court the Debtor has reasonable prospects of achieving reorganizability within a reasonable time, and not whether the Debtor is presently reorganizable. This view is

---

1. Unless otherwise stated the references to Section 207(b) in this opinion are intended to be limited to the 120-day provision.

2. " . . . any and all documents related to (a) current negotiations with labor unions, (b) negotiations with the Commonwealth of Massachusetts and the State of New Hampshire in respect of possible sales of rights-of-way, and (c) the identity and traffic originations of shippers . . . . "

buttressed by the limited period of time allowed for the court to make its determination. One hundred twenty days is patently not adequate time for the court, in the absence of a definitive plan which has had the approval and certification of the ICC and which parties in interest have had an opportunity to analyze and file objections thereto, to formulate any type of reorganization involving the findings and determinations required by Section 77(e) of the Bankruptcy Act.

There is nothing in the Act itself, or in the legislative history, which requires the determination to be made with reference to any plan of reorganization. As a matter of fact, under the order of the ICC, the Debtor's trustees are not required to submit a definitive plan earlier than June 30, 1974, a time beyond the 120-day provision deadline. There is no requirement in Section 207(b), or in any other provision of the Act, which confines the court to the pending record of reorganization proceedings in determining the question of reorganizability. Since the Act does not require the question to be resolved with reference to any plan, and, in the view of the court, the Act does not require a determination of the certainty of present reorganizability, the trustees and all interested parties were notified of the opportunity to address the court on the questions posed by Section 207(b). Obviously, the time taken to arrange for the hearing, and the hearing itself, cut substantially into the 120 days allowed under the Act. However, no alternative measures to inform the court of relevant factual and legal matters seemed feasible.

A. *Income basis.*

■ "Income basis" is not defined in the Act, and there is no reference to the phrase in Section 77 of the Bankruptcy Act. The phrase, apart from the context in which it is set and must be read, is susceptible of many meanings. For example, documentary exhibits which were compiled for the hearing, particularly exhibits which were compiled in compliance with the requirements of the ICC, refer variously to income in these words: "railway operating income", "net railway operating income", "other income", "total income", "income available for fixed charges", "income after fixed charges", "ordinary income", "net income". Most participants at the hearing focused on "net railway operating income" as the critical factor. "Net railway operating income" (NROI) means the income from railway operations after deducting operating expenses, including maintenance and equipment obligations. Substantial evidence was offered to show the NROI of the railroad in the years before and after the bankruptcy of the Debtor, and in an attempt to predict NROI in the years ahead; and the court accepts the concept of NROI as the income basis on which the determination under Section 207(b) must be made.

B. *Reasonable time.*

■ This phrase is not defined in the Act, and there is nothing in the legislative history of the Act by which to measure the "reasonable time" allowance in this proceeding. However, Congress must have known of the average time span of ten years experienced in the 23 railroad reorganizations under Section 77, and it is significant that, although Congress did establish several deadlines in the Act, it imposed no fixed deadline by which reorganization must be achieved, if at all.

What is a reasonable time in the context of an endeavor such as this depends upon many factors, and can be determined only when all the factors have been marshalled and weighed. It was argued by one of the participants that the Act imports a sense of urgency, and therefore the determination of reorganizability should be made in light of this factor. The argument loses its force when it is remembered that Congress chose not to establish a deadline date when reorganization must be achieved, if at all. Rather, the answer to the question of what is a "reasonable time" would most logically depend upon two

factors: one, the lengths of time which prior experience has established that railroads in Section 77 proceedings have taken to reorganize and two, the present situation of the Debtor in the light of what has occurred since the reorganization petition was filed. Upon consideration of these two factors, it is the opinion of the court that a "reasonable time" period is not necessarily limited by the year 1976, which the trustees testified was the presently projected year for the reorganization of the Debtor.

II. *Debtor's rail lines. Territory served.*

Debtor operates about 1400 miles of track within the four New England States of Maine, New Hampshire, Vermont and Massachusetts, and for a short distance in the State of New York. It is primarily a carrier of freight, although it does operate 178 miles of passenger commuter service radiating from Boston as the hub for the account of the Massachusetts Bay Transportation Authority (MBTA). Most of these commuter lines are also used for freight service. The Debtor also has entered into an agreement with AMTRAK under which the Debtor provides train and engine crews for passenger train service, normally one train daily in each direction, between Springfield, Massachusetts, and White River Junction, Vermont. This service provides a link in AMTRAK's passenger train service between New York and Montreal, P.Q., Canada.

Debtor's east-west main line terminal points are at Rigby, Maine (south of Portland) in the east, where the Debtor connects with the Maine Central Railroad, and at Rotterdam Junction, New York, in the west, where there is a connection with the Penn Central. The major freight interchange point on the east-west route (in fact the major interchange on the Debtor's system) is at Mechanicville, New York (east of Rotterdam Junction) where Debtor connects with the Delaware and Hudson Railroad.

Between Mechanicville and Rigby the main line runs through the northern part of Massachusetts, and the cities of Greenfield, Gardner, Fitchburg, Ayer, Lowell and Lawrence, and thence into New Hampshire through Rockingham and Dover. From Ayer, lines run south to Worcester, which is a principal freight interchange point with the Penn Central, and southeast to Boston. Lines radiate from Boston to Concord, New Hampshire, and Portland, Maine, crossing the east-west main line at Lowell and Lawrence, respectively, and joining the main line at these points. A line also runs from Boston to Portsmouth, New Hampshire. At Worcester there is a connection with the Providence and Worcester Railroad, which operates the Debtor's line between Worcester and Gardner under a temporary permit from the ICC.

Another major line, the Connecticut River Line (sometimes called the "Canadian" segment), runs north from Springfield, Massachusetts, where it connects with the Penn Central, and joins the east-west main line at Greenfield. The Connecticut River Line continues north of Greenfield to Bellows Falls, Vermont, where it connects with the Vermont Railway, and beyond to White River Junction, Vermont, thence to Wells River, Vermont, and Whitefield, New Hampshire, and ultimately to Berlin and Groveton, New Hampshire. At White River Junction there is a freight interchange with the Central Railroad of Vermont; at Woodsville, Vermont, nearby Wells River, a freight interchange with the Canadian Pacific Railroad; at Whitefield a connection with the Maine Central; and at Berlin and Groveton the Connecticut River Line connects with the Canadian National Railroad.

In addition the Debtor operates branch lines in Massachusetts and New Hampshire from the major lines. Some of the branches run from one of the major lines to another, while others have off-main-line terminal points. At the

end of 1971 the Debtor's mileage in the states it served was as follows:

| New Hampshire | 681 | Vermont | 104 | Maine | 46 |
| Massachusetts | 603 | New York | 63 | Total | 1497 |

Because of abandonments of branches in New Hampshire and Massachusetts since 1971, the total mileage presently is approximately 1400.

### III. *Traffic routes.*

The Debtor is primarily a terminating and bridge carrier of freight, that is, a large share of its total traffic is received from connecting carriers for delivery to consignees on Debtor's lines or to other carriers. Somewhere between fifteen and twenty per cent of the total traffic originates on its own lines and is delivered to other carriers. Only a very small part of the total traffic originates and terminates on its own lines.

As already mentioned, the principal interchange of traffic is with the Delaware and Hudson (D & H) at Mechanicville. The D & H is mainly a bridge carrier of freight. Its lines extend westerly from Mechanicville to Binghampton, New York, where it interlines east-west traffic with the Erie-Lackawanna Railroad (E–L) and the Lehigh Valley Railroad (LV), and southerly to Wilkes-Barre, Pennsylvania, where its principal connection is with the LV.

Debtor also has freight interchanges with the Penn Central (PC) at Rotterdam Junction, Worcester and Springfield, and to a lesser extent at Lowell and Boston. Freight interchanges with railroads serving Canada are at Woodsville with the Canadian Pacific Railway (CPR), at White River Junction with the Central Vermont Railroad (CV), and at Portland, Berlin and Groveton with the Canadian National Railway (CN).

The Vermont Railway interchanges with the Debtor at White Creek, New York and Bellows Falls, Vermont. The interchange with the Maine Central Railroad (MeC) at Portland enables the Debtor to receive traffic interlined by the Bangor and Aroostook Railroad (BAR) with the MeC.

The Debtor's principal competitor for rail service in New England is the Penn Central. Since Penn Central's acquisition of the New York, New Haven & Hartford Railroad (New Haven) at the close of 1968, the PC has become more formidable as a competitor from the standpoint of operating economies and the ability to route traffic efficiently. Notwithstanding the PC's advantages, Mechanicville continues to be the Debtor's major interchange point. There the D & H provides to the Debtor the only gateway to and from New England not controlled by the Penn Central.

### IV. *The railroad in reorganization.*

The trustees [3] assumed control of the Debtor and its properties in May 1970 during a severe decline in freight traffic affecting eastern railroads generally. They took over a railroad that had suffered uninterrupted deficits in net income beginning in 1958, with unpaid property taxes and unpaid interest on its bonds, and after a twelve-year period during which management had made wholly inadequate capital expenditures. In the late 1960's the stockholders of the Boston and Maine Corporation declined to join a proposed ICC approved affiliation with the Norfolk and Western Railroad, the E–L and the D & H, and the bondholders thereafter instituted the reorganization proceedings. In his report (Exhibit 2), Administrative Law Judge von Rinteln pointed out: "Its [B

3. The trustees currently are Robert W. Meserve, a Boston lawyer, and formerly president of the American Bar Association; and Benjamin II. Lacey, also a Boston lawyer. Mr. Meserve was appointed as one of the original three trustees, and for a time served as the sole trustee. Mr. Lacey was appointed trustee on June 21, 1973. Paul W. Cherington, currently president and chief executive officer of the Debtor, was appointed one of the original trustees, and his resignation as trustee became effective on January 6, 1972. He was employed as chief executive officer of Debtor by the trustees under an order of the court entered December 19, 1972. When appointed a trustee Mr. Cherington had had broad transportation experience in the federal government and in the academic community, and his profession was that of transportation consultant.

& M's] last heavy expenditures for equipment were made in the mid 50's. Tie-laying and track-replacement programs were neglected" (at 25). Judge von Rinteln was critical, indeed, of the "less conservative management group" that guided, or rather misguided, the affairs of the railroad in the late 50's when the era of deficits commenced (at 25).

The trustees brought in new and vigorous management. They commenced a program to give effective attention to the worst problems of the railroad, and to build up the physical assets and improve rail service. They undertook an extensive locomotive and car repairing program; effected a reduction in the number of employees, mostly by elimination of nonessential positions, consolidation of jobs, and leaving unfilled vacancies caused by retirements; maintained satisfactory relations with labor unions; carried out a program, to the extent they have been allowed to do so, of track rehabilitation; acquired by lease twelve new locomotives and almost all the 700 new box cars ordered in 1973; improved its data processing operations; reduced rentals by transferring personnel from Boston to Billerica; made necessary repairs to the Hoosac Tunnel; and concluded negotiations for a new automobile unloading facility at Ayer which is reasonably expected to increase traffic on Debtor's lines.

As a consequence of these and other management decisions, the Debtor has been enabled to upgrade and improve the level of its railway services; improve its employee morale; reduce the number and frequency of accidents; reduce the slow orders on its main lines; improve its cash position, and make substantial progress toward reorganization. Although not seeing eye to eye with the trustees in certain important matters, representatives of the bondholders have nevertheless acknowledged that the trustees have done an admirable job.

A. *Trustees' forecasts in the December 20, 1971 interim plan.*

In the Fall of 1971, before the final figures of the year were available, the trustees undertook to formulate an interim plan aimed at reorganization and to make forecasts of traffic, operating expenses, costs and income through 1976. Their forecasts were based upon the assumption that traffic throughout that period would follow the Wharton Econometric Model as an available national economic projection, with adjustments downward therefrom because the New England economy in respect of rail traffic increases lags behind the national average as a whole. After projecting revenues and operating expenses, the predicted NROI through 1976 ranged from a loss of $2.5 million in 1971 to a profit of $2.0 million in 1974 which tapered off to $0.8 million in 1976. On the basis of these projections the trustees concluded that reorganization could not be achieved unless a comprehensive program was implemented to raise the NROI to approximately $6.0 million, the income figure they believed was required to support a viable reorganization. Accordingly, they set their sights toward other sources and avenues of potential earnings in a series of programs called the "Trustees' Action Plan".

The Action Plan visualized potential increased annual earnings of $13.5 million. The series of programs included (a) capital improvements, (b) abandonments, (c) additional relief from New Hampshire and Massachusetts, (d) sale of commuter lines to MBTA, (e) sale of other real estate, (f) tax abatements, (g) labor costs savings, (h) review of rates, (i) Canadian differentials, (j) freight sales blitz, (k) negotiations with Bomaine concerning tax carry forwards, and (*l*) cost reductions at Portland Terminal.

Judge von Rinteln made a detailed study and evaluation of the trustees' interim plan and the Action Plan in his report (Exhibit 2 at 50–74), which he completed on February 13, 1973. He

concluded that only the proposals for eliminating the Canadian differentials and for effecting large savings at the Portland Terminal "appear misdirected". It was his view, however, that

> The progress so far made, together with the capital improvement program and the other programs which made up the Action Plan, puts the B & M on the threshold of being able to reorganize with profitable operations in time for the Trustees' target date at the end of 1974. However, while the Trustees' Plan is basically sound, the predicted increase in revenues has not yet been forthcoming, and the Action Plan programs cannot be expected to yield as much as predicted. Consequently, the Trustees' Plan must be augmented by additional elements which can be counted upon to make a specific positive contribution towards reestablishing the B & M as a profitable railroad and at the same time raise as much money as possible for paying its debts. Such additional elements can in large part be found among the various proposals so far advanced by Amoskeag, the Commonwealth of Massachusetts, the Penn Central, the Institutional Bondholders, and other parties to this proceeding.

*Id.* at 108.

In concluding his extensive and detailed report, Judge von Rinteln adopted the December 20, 1971 interim plan of the trustees "as modified by the [D]iscussion and [c]onclusions herein", and directed the trustees to file a definitive plan by June 30, 1974 (at 130). Simultaneously, he rejected other plans submitted by Amoskeag Company and the Group of Institutional Bondholders.

Meanwhile, 1972 had been a disappointing year.[4] The traffic forecasts of the trustees for 1972 "completely missed", as Judge von Rinteln remarked

at page 109 of his report. Although there had been an increase of freight tonnage in the early part of the year, certain events later occurred that caused a decline in 1972 traffic. First, Hurricane Agnes substantially disrupted connecting freight from the Penn Central, Lehigh Valley and Erie-Lackawanna railroads. The Debtor did not suffer damage from the storm, but the effect was seriously disruptive. Next, a management decision to eliminate the assembly yard at Mechanicville found the Debtor unable for about three months, due to the confusion caused by Hurricane Agnes, to meet the requirements of many of its shippers and otherwise to cope with the unusual rail conditions brought about by the hurricane. Finally, the collapse of a portion of the Hoosac Tunnel on the main line from Ayer to Mechanicville necessitated for a time diversion of the east-west traffic to the Penn Central. These events, coupled with a fall-off in the New England economy, had a substantial adverse effect on the trustees' projections in tonnage and revenues. Whereas the trustees had forecast a 1972 NROI loss of $1.0 million, the actual loss was $5.5 million. With all this in view, however, Judge von Rinteln was of the opinion that "[a]lthough the eastern carriers have accounted for a declining share of the total railroad traffic in recent years, the buoyant effect of a recovery from the 1971–1972 nadir and of government assistance to certain of the B & M's connections as a result of Hurricane Agnes, encourage the assumption that eastern railroads, including the B & M, will be able to do as well as railroads in the rest of the country through 1976" (Exhibit 2 at 46). It was his view that freight tonnage projections were more reliably based on the statistics set forth in *U. S. Industrial Outlook 1972 with Projections to 1980*, U. S. Department of Commerce

---

4. In fact, the U. S. Department of Commerce publications U. S. Industrial Outlook 1972 with Projections to 1980 and U. S. Industrial Outlook 1973 with Projections to 1980 indicate that U. S. railroads had experienced only a 3% increase in cargo ton miles in 1972 while an 8% increase had been projected. It is apparent that not only the B & M but the entire railroad industry suffered a disappointing year in 1972.

(April 1972), and that the Wharton Econometric Model "need not be the only basis for formulating a projection for B & M traffic" (Exhibit 2 at 46).

Thus, after hearings of 21 days, at which numerous parties in interest and other persons participated (Exhibit 2 at 4, 5), Judge von Rinteln concluded that the Debtor was reorganizable under the trustees' December 30, 1971 interim plan, as modified by the discussion and conclusions set forth in his report.

B. *Trustees' 1974 forecasts.*

In 1974, shortly before the hearing held by the court, the trustees made projections of its operations through 1976, and forecast the NROI for 1974 at $0.6 million, for 1975 at $4.0 million, and for 1976 at $6.1 million.

These forecasts rely basically upon (1) the traffic forecasts made under the direction of Charles R. Drake, vice-president of the Debtor in charge of traffic, and (2) the predicted operating expenses prepared under the direction of Alan G. Dustin, executive vice-president and chief operating officer of Debtor since July 1973.

Mr. Drake assumed his duties with Debtor on January 1, 1972, after 24 years of railroad experience with the New York Central and Penn Central railroads. His work with the New York Central included duties as freight sales manager, manager of piggyback sales, assistant manager of industrial development, and in the treasurer's office. He was assistant vice-president of the Penn Central before assuming his present duties with the Debtor. Mr. Dustin's railroad career encompasses 27 years. He was with the Delaware and Hudson as train master and assistant to the president; and with the Erie-Lackawanna as assistant to the vice-president in charge of operations and maintenance, and superintendent of the Scranton Division. He was executive vice-president of the Bangor and Aroostook Railroad before assuming his present duties with Debtor.

Mr. Drake's forecasts were not solely dependent upon standard prediction tables. His projections assumed a basic static economy in New England through 1976, and did not take into account (except for coal and piggyback traffic) any favorable impact attributable to the energy crisis. He did not factor in any freight rate increases beyond those in effect on March 16, 1974. He acknowledged that coal traffic on Debtor's lines is difficult to forecast, since it is so closely tied to the energy crisis. He made his estimates as to coal traffic after taking the practical and common-sense step of surveying on-line users and potential users of coal. He predicted freight revenues (in millions) of $77.9 in 1974, $79.9 in 1975, and $81.3 in 1976. These compared with freight revenues of $68.0 million in 1973, the highest level reached by Debtor in 24 years, climbing to that level from a low of $52.0 million in 1965. Freight revenues for the first three months of 1974 show a continuation of the upward trend. This trend is consistent with the predicted increases set out in U. S. *Industrial Outlook 1974 with Projections to 1980,* U. S. Department of Commerce (1974). His estimates reasonably took into account the freight traffic expected from the use of the new automobile loading facility at Ayer. In general, the projections were on the conservative side.

Mr. Dustin's projections of operating expenses 1974 through 1976 assumed the 1973 experience as the base for all departments (Operating, Mechanical and Engineering), and included adequate estimates of manpower, wage and benefit increases, and price advances of materials. The main attack on his estimates focused on the amounts allowed for major maintenance to track, ties and roadbed. It was apparent that, although the main line track meets Federal Railroad Admission Track 3 Standards (FRA3)—that is, permissible maximum operating speed of 40 mph for freight traffic, and 60 mph for passenger traffic—Mr. Dustin was fully aware that Debtor's track structure shows signs of

deterioration, though not of epidemic proportion. He acknowledged that this condition resulted from deferred maintenance. He was of the opinion that determining the level of appropriate major maintenance to meet the condition was a complex task. In his projections he provided an allowance for more maintenance than would be normally sufficient to maintain the tracks in their present condition, recognizing that a greater allowance would not be improper.

The trustees' projections through 1976 include the possibility of freight rate increases. This is not an unreasonable assumption in the light of increases made in recent years, and the concerted efforts of practically all Class I railroads to secure an increase in 1974. Property taxes were forecast at two-thirds the anticipated billings in the expectation that the Massachusetts city and town taxes will be settled at the two-thirds level.

### C. Boston and Maine Study Group.

This Group was comprised of representatives of agencies of the Commonwealth of Massachusetts, viz., the Massachusetts Port Authority, Department of Public Works, Office of Transportation and Construction, Massachusetts Bay Transportation Authority; staff of the New England Rail office; and transportation management consultants from Harbridge House, Inc., of Boston. Their central objective was the study and evaluation of the current and probable future economic viability of the Debtor. In a preliminary report issued October 26, 1973 the Group concluded that the December 20, 1971 interim plan of the Debtor's trustees probably would not result in a viable railroad. They recognized, however, that the railroad of the Debtor was essential to the well-being of the New England economy. In a supplementary report issued on March 12, 1974, the Group concluded

> that the prospects of a successful reorganization of the B & M remain a grave uncertainty. At the lower end of the Study group's updated range of

forecasts, reorganization would clearly not be possible. However, achievement of the upper end by 1976, involving substantial growth in tonnage and a narrowing of the gap between freight rate increases and inflation, would be a sign that reorganization could be achieved a few years later. (Exhibit 24 at 13).

### V. Conclusions as to reorganization

1. The court is of the opinion that in the light of pertinent circumstances and conditions, including the past experience and prospects for the future, the Debtor has reasonable prospects of achieving reorganizability on an income basis within a reasonable time under Section 77 of the Bankruptcy Act. On the basis of its recent record of performance the Debtor is not reorganizable at this time. There are favorable factors, however, which in the opinion of the court support the determination of reorganizability.

2. The quality of the Debtor's management team, under Messrs. Cherington, Dustin and Drake, affords it the best opportunity during the history of the reorganization proceedings to turn the railroad around from a series of yearly deficits to a profitable venture. The importance of railroad management cannot be minimized. As Miss Benham put it in her testimony: management is the most important factor in railroad operations. The experience and competence of the men who now direct the operations of the railroad give solid basis for increased optimism concerning the affairs of the Debtor.

3. The accomplishments of the trustees have been substantial in restoring the level of service during their stewardship, particularly in the early years in the face of declining freight traffic. They have made good progress in cutting costs of operations by reducing the work force. In the opinion of Judge von Rinteln the trustees' proposed interim plan of reorganization is a good one. The trustees believe the probabilities of Debtor's reorganizability on an income

basis are better now than in January 1973 when Judge von Rinteln filed his report.

4. The 1973 performance of the Debtor is generally encouraging. Net tonnage was up by nearly 3.5% over 1972, reversing the downward trend. Revenues were up 7.5% over 1972, while railway operating expenses rose only 3.5%. Ton-miles increased nearly 3% over 1972 with a corresponding percentage increase in revenue per ton-mile.

5. At this point, an increase in traffic volume would make a big difference to the Debtor. There are signs that railroads generally will benefit from the energy crisis in the long run. The fuel-efficiency advantages of railroads over trucks should benefit the railroad industry, and there appears no reason why the Debtor will not share in these benefits. The very strong probability of increased use of coal by utilities should work to the advantage of the Debtor. The probability of an upturn in piggyback traffic, as shippers and, indeed truckers themselves, find it increasingly advantageous to use railroads rather than highways for long hauls, is a favorable sign as regards Debtor's future. Increases in freight traffic would provide the added advantage of increasing the Debtor's productivity.

6. There are, of course, problems in speculating as to what will be the future actions of the ICC in allowing freight rate increases. But in light of the history of rate increases in recent years and the current efforts of practically all railroads to effect a rate increase for 1974, it is not unreasonable to assume increases will occur and freight revenues will thereby increase. Moreover, although in the past rate increases have lagged increased costs by an uncomfortable margin, there are encouraging signs that the ICC actions granting increases will be more promptly forthcoming to meet rising costs. Thus the possibility grows strong of an accelerated narrowing of the gap between freight rate increases and inflation.

7. The trustees are continuing to carry forward certain facets of their Action Plan. Negotiations for tax abatements, the abandonment program, sale of commuter lines to MBTA, and a program of sales of real estate not necessary for freight operations are going forward. Debtor's railroad is of moderate size comparatively, and the trustees are seeking to shrink the plant to a size more proportionate and adaptable to its freight operations. They also seek to abandon unprofitable branch lines. These shrinking programs take time to accomplish, but the trustees continue diligent in their efforts. The tax abatement efforts also take time, and there are encouraging prospects for abatements and probably other tax relief in Massachusetts, but lesser immediate prospects in the other states. The trustees are fortified in their negotiations, however, not only by the precedents of tax relief awarded in other New England railroad reorganization cases, but by the strong interest of the states, particularly the New England states, in the continued operation of the Debtor. Thus the possibility of significant tax relief to Debtor appears strong. Still other facets of the Action Plan are continuing with management constantly striving for labor costs savings, an enhanced capital improvements program, and for new traffic. The accomplishment of all these programs of the Action Plan would have a positive effect on the Debtor's earnings. While the savings generated from the programs would not be as much as the trustees estimated in 1971, they nevertheless would be significant.

8. The trustees recognize that the Debtor cannot be reorganized without the capital improvement program they planned in 1971. They have not been successful in obtaining approval for their track program because of objections by bondholders, and they have ac-

complished only part of what they visualized. From the improved cash position of the Debtor they have sought to implement the capital improvement program, at least in part. Judge von Rinteln was of the view that the program should be promptly implemented, and that "[t]o the extent that funds become available from the B & M's cash flow they should be used in the capital improvement program, and if such funds are not available the Trustees should request that the funds realized from the B & M property sales be used for that purpose" (Exhibit 2 at 110). Judge von Rinteln's report adopting the trustees' interim plan, as he modified it, is not binding on the court in the Section 207(b) determinations. However, there were no persuasive attacks upon the competence of the report in its analysis of Debtor's problems or in the recommendations. Some of the projections relating to tonnage and revenues constructed by Judge von Rinteln appear optimistic in light of the Debtor's performance in the disappointing year 1972 and the first three quarters of 1973, but in view of recent U. S. Department of Commerce publications[5] his projections may well prove conservative in the long run. In the fields of railroading and reorganization it is to be expected that expertise will be found with the ICC and its staff, and its analyses and recommendations should not be lightly treated. Accordingly, the court has given the contents of the report weight and deference in considering the Section 207(b) questions.

9. The absence of a definitive plan of reorganization has handicapped the court in making its determination of reorganizability. In the initial stages of the study, with no definitive plan in view, financial statements of past performances presented a myopic perspective, and beclouded other vital factors related to Debtor's prospects. However, as the evidence unfolded and the exhibits were studied, and the broad support for the trustees' goal of reorganization became apparent, there emerged the conviction that Debtor has indeed reasonable prospects of earning power sufficient to develop an NROI adequate for reorganization. Nevertheless, the trustees are overly optimistic in stating their belief that reorganization can be achieved by the end of 1976. In addition, in the light of Miss Benham's testimony, the trustees may be restrictive in fixing their goal of NROI necessary for reorganization at $6.0 million. It does not appear to the court that by the end of 1976 they will have accomplished the necessary scaling down of the physical plant and implementation of the capital improvement program required for reorganization. Once these are accomplished, however, a lower NROI than $6.0 million might well support a proper capitalization. All the evidence indicates that reorganizability can be achieved, but not earlier than the middle of 1978. The court finds reorganization by that time as being within a reasonable time within the purview of Section 207(b).

## VI. *The public interest question.*

On this issue, testimony was received from many and various quarters including shippers, officials of other railroads, labor union officers, local and state commercial associations, and officials of state governments. The evidence presented unanimously supports generally the view expressed in the "Preliminary Report of the Boston and Maine Study Group" that

---

5. In *U. S. Industrial Outlook 1972 with Projections to 1980* (U. S. Department of Commerce), it was estimated that the compound annual rate of growth of cargo ton-miles for United States railroads between 1971 and 1980 would be 3% so that cargo ton-miles were expected to reach 960 billion in 1980, whereas the most recent prediction, in *U. S. Industrial Outlook 1974 with Projections to 1980*, now estimates that a compound annual rate of growth of 3.3% will occur between 1973 and 1980 and that cargo ton-miles will reach 1,039 billion by 1980.

The continued operation of B & M rail lines is essential to the well-being of the New England economy.

—At least 51,250 jobs in the five states served by the B & M and some $811 million of value added, including $445.3 million of wages and salaries, are directly dependent on the continued service over B & M lines.

—Loss of B & M service would result in a 1 to 5 percent increase in the prices paid for major consumer commodities.

*Id.* at 1.

The need for competitive rail systems serving New England is apparent from the attitude of shippers in their preference for routing flexibility. The court is convinced that the future of rail service in New England must provide for continuation of such routing flexibility and competition in freight traffic.

■ While the final system plan as provided for under Section 206 of the Act as it may ultimately evolve, and as it may relate to rail services in New England, lies a long way off in the future, the court has considered the preliminary plan—the only available plan—as it was required under Section 204 of the Act, and is set forth in the Report of the Secretary of Transportation, issued February 1, 1974. In light of the proposals in that report, the court cannot ignore the likelihood that the final system plan might reduce significantly the services provided by the Debtor in certain parts of New Hampshire, Vermont and Massachusetts, thereby cutting off all rail service to certain areas, and in other areas destroying competitive rail service. This likelihood—that significant reductions in the services provided by the Debtor would result—casts a large shadow over the New England economy. Accordingly, the court determines that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under the Act.