In the Matter of BOSTON AND MAINE CORPORATION, Debtor.

No. 70–250–M.

United States District Court, D. Massachusetts.

Feb. 23, 1983.

---

5. *See* footnote 2, *supra.*

See also D.C., 46 B.R. 960.

Charles W. Mulcahy, Jr., and Robert M. Gargill, Paul M. Stein and Richard L. Wulsin, Choate, Hall & Stewart, Boston, Mass., for trustees of debtor.

James E. Howard and Kathleen D. Hendrickson, Kirkpatrick, Lockhart, Johnson & Hutchinson, Pittsburgh, Pa., and James D. St. Clair, Harold Hestnes, and Nancy D. Israel, Hale & Dorr, Boston, Mass., for Guilford Transp. Industries, Inc.

Joseph H.B. Edwards, Bingham, Dana & Gould, Boston, Mass., for First Mortgage Trustees.

Joseph D.S. Hinkley and Linda D. Chase, Peabody & Arnold, Boston, Mass., for Second Mortgage Trustees.

Philip W. Burling, Foley, Hoag & Eliot, Boston, Mass., for Group of Institutional Bondholders.

Edward T. Robinson, Gaston Snow & Ely Bartlett, Boston, Mass., for Madison Fund.

Jane A. Restani, Civ. Div., U.S. Dept. of Justice, G. Joseph King, Federal Railroad Admin., U.S. Dept. of Transp. and John J. McCarthy, Jr., I.C.C., Washington, D.C., for the U.S.

William C. Hennessy, New York State Dept. of Transp. and James A. Arpante and Henry A. DeCostis, Office of Atty. Gen., Albany, N.Y., for the State of N.Y.

Vincent Losinno, Executive Office of Transp. and Construction, Comm. of Mass., Boston, Mass., for the Comm. of Mass.

John T. Collins, Sherburne, Powers & Needham, Boston, Mass., for Vermont and Massachusetts R. Co., Chesapeake and Ohio Ry. Co., Baltimore and Ohio R. Co., Western Maryland Ry. and Maine-New Hampshire Interstate Bridge Authority.

Charles H. White, Jr., Arnall, Golden & Gregory, Washington, D.C., for Canadian Pacific Ltd.

Joseph F. Ryan, Lyne, Woodworth & Evarts, Boston, Mass., and John L. Richardson, Verner, Liipfert, Bernhard & McPherson, Washington, D.C., for Providence and Worcester R. Co.

Rogers & Wells, New York City, for Committee of Interline Railroads.

Stanley M. Poster and Ellen L. Poster, Boston, Mass., for Penn Cent. Corp.

Joseph F. Ryan, Steven B. Levine, Robert E. Brooks and Hirsh Freed, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for City of Cambridge, Mass.

Lance R. Pomerantz, Law Dept., Boston, Mass., for City of Boston, Mass.

Bruce H. Tobey, Office of Gen. Counsel, Gloucester, Mass., for City of Gloucester, Mass.

Charles H. Morang, Office of City Atty., Keene, N.H., for City of Keene, N.H.

## OPINION

FRANK J. MURRAY, Senior District Judge.

The Trustees of the Debtor in reorganization, the Boston and Maine Corporation ("B & M"), filed with the Interstate Commerce Commission ("Commission") in December 1975 their plan of reorganization, and subsequently amended the plan on December 29, 1980, again on July 15, 1981 and finally on March 3, 1982. The Commission on April 23, 1982 approved the plan as finally amended (the "Amended Plan") finding that "the Amended Plan, which provides for the conservative capitalization of B & M on essentially an all equity basis and provides for continuation of the existing service on a vital link of the New England Rail System, satisfies all relevant statutory criteria and is in the public interest". (I.C.C. Decision at 25).[1] The Commission certified the Amended Plan to this court on June 28, 1982.[2]

---

1. *Boston and Maine Corporation—Amended Plan of Reorganization,* I.C.C. Finance Docket No. 26115 (Sub-No. 12), and *Guilford Transportation Industries, Inc.—Control—Boston and Maine Corporation,* I.C.C. Finance Docket No. 29720 (Sub-No. 1), Decided Apr. 23, 1982 ("I.C.C. Decision").

2. Section 77(e) of the former Bankruptcy Act [11 U.S.C. § 205(e) ] in the sixth sentence provides that:

If the judge shall approve the plan, he shall file an opinion, stating his conclusions and the reasons therefor, and enter an order to that effect, and shall send a certified copy of such opinion and order to the Commission.

Viewed broadly, the goal of the Trustees under the Amended Plan is a Boston and Maine Corporation reorganized and continuing as an operating railroad with a revised capitalization on a substantially all equity basis, with all of the outstanding new Common Stock issued to Guilford Transportation Industries, Inc. ("Guilford") (thus vesting in Guilford control of the reorganized corporation), in the expectation that B & M thus reorganized will be a financially viable operating railroad capable of providing rail commuter service, under contract with Massachusetts Bay Transportation Authority ("MBTA"), and freight service over existing rail lines (including many of the lines presently utilized for commuter rail service).

Since 1970 B & M has been in this court in reorganization proceedings under Section 77, and before referring to the significant features of the Amended Plan and the issues involved in the question of its approval, it is well to begin with a brief history of the proceedings.

I

On March 12, 1970 several bondholders (herein the "Group of Institutional Bondholders")[3] filed in this court a petition for reorganization of B & M under the provisions of Section 77. For many years prior to 1970 B & M had been in poor financial health, having suffered uninterrupted deficits in net income, debts arising from unpaid property taxes and unpaid interest on its bonds, and a decline in traffic and earnings resulting from a twelve-year period of inadequate capital expenditures.[4] It was upon the failure of B & M to pay the interest due on the First Mortgage Bonds as of February of 1970 that these reorganization proceedings were instituted. Charles W. Bartlett, Esquire, Paul Cherington, and Robert W. Meserve, Esquire, were appointed by the court to serve as Trustees[5] of the Debtor's property.

The debts owed by B & M and the claims against it on March 12, 1970, the date of bankruptcy, were as follows:[6]

| Secured claims | |
|---|---|
| Bondholders and Creditors holding Securities | $ 81,779,442.30 |
| Real Estate and Other Tax Claims | 7,621,704.10 |
| **Unsecured claims** | |
| Personal Injury and Property Damage | 1,896,355.06 |
| Interline Per Diem Claims | 11,284,587.23 |
| Interline Freight/Overcharge Claims | 567,763.86 |
| Shippers and Consignees Freight Claims | 2,972.492.00 |
| Shippers and Consignees Overcharge Claims | 173,657.50 |
| Private Car Hire | 503,653.43 |
| Materials, Supplies, and Services Rendered | 8,600,327.98 |
| Total | $115,399,983.46 |

Within the first year following the filing of the bondholders' petition, separate plans of reorganization were filed with the Commission by the petitioning bondholders and by the directors of B & M. Both plans sought inclusion of B & M in the Norfolk & Western Ry. system and failing that, abandonment and liquidation of the properties of B & M. The Trustees of the Debtor also petitioned the Commission for inclusion of B & M in the Norfolk & Western Ry. system. In addition, the petitioning bondholders, gravely concerned that the railroad might not be financially able to continue operations, applied to the Commission for abandonment of the entire B & M rail lines. By mid-1971, however, it appeared

---

**3.** The Equitable Life Assurance Society of the United States, Metropolitan Life Insurance Company, Connecticut Mutual Life Insurance Company, and the Northwestern Mutual Life Insurance Company, holders of First Mortgage bonds of B & M in the aggregate principal amount of $14,198,000, or about 30 percent of such bonds outstanding.

**4.** *Boston and Maine Reorganization*, I.C.C. Finance Docket No. 26115, Report and Order Recommended by Victor A. von Rinteln, Adm. Law Judge, Feb. 2, 1973, at 25.

**5.** The assignment of this reorganization case in the first instance was drawn by the late District Court Judge Francis J.W. Ford, who appointed the three Trustees. Mr. Cherington resigned as Trustee as of December 21, 1971, and Mr. Bartlett resigned as of January 9, 1973. Benjamin H. Lacy, Esquire, was appointed Trustee on June 21, 1973. Upon reassignment, the case was drawn by the author of this opinion on November 9, 1973.

**6.** *See* n. 4, *supra* at 35.

there was no imminent likelihood of interruption of B & M's rail service for lack of operating funds, and on September 29, 1971 the Commission rejected the pending plans of reorganization, and denied the Trustees' petition for inclusion of the Debtor in the Norfolk & Western Ry. system and the bondholders' application for abandonment.

In December of 1971 the Trustees filed an "interim or contingency" plan of reorganization which, along with alternative plans of reorganization filed by Amoskeag Company and by the Group of Institutional Bondholders, became the subject of extensive hearings before an Administrative Law Judge in 1972. The Commission adopted the report of the Administrative Law Judge, filed on February 13, 1973, that the Trustees' plan was basically sound and the proposals valid, but that additional measures were required to provide for a modified capital structure, reduction of taxes and an adequate cash flow before B & M could satisfy its creditors and become a profitable railroad operation. The interim plan was approved as modified by the discussion and conclusions in the report of the Administrative Law Judge, and the Trustees were directed by the Commission to file a definitive plan on or before June 30, 1974. The plans of Amoskeag Company and the Group of Institutional Bondholders were rejected.

The plan of reorganization next proposed by the Trustees was the 1975 Plan, filed with the court on December 12, 1975,[7] which contemplated reorganization of B & M in two steps. A definitive First Step, which the Commission and the court approved in 1976, provided for the sale by B & M to MBTA for $39.5 million in cash of the commuter rail lines radiating northerly and westerly from the North Station in Boston, and certain other properties. The

conveyance by the Trustees of the rail lines to MBTA was subject to the reservation in perpetuity of an easement by the Trustees to operate freight service over the lines. It was further provided under the First Step that the Trustees would continue to operate the commuter rail service, under an operating agreement with MBTA, over the rail lines conveyed. The Second Step comprised measures to be taken to satisfy claims of creditors against the Debtor's estate and to recapitalize B & M.

The commuter rail lines (and other properties) were conveyed to MBTA on December 26, 1976 free and clear of all claims, except the reserved easement. On January 1, 1977 the operating agreement became operative. During 1977 the court approved a second operating agreement between B & M and MBTA covering commuter rail service over additional commuter rail lines extending southerly and southwesterly from the South Station in Boston, which service had previously been provided by Consolidated Rail Corporation ("ConRail"). Under this agreement B & M, in the latter part of 1977, undertook operations of the commuter rail service from the South Station.

The Trustees were not at this point in a position to carry out the Second Step of the 1975 Plan because of the heavy operating loss sustained in 1976. Believing that existing conditions offered dim prospects for precise implementation of the Second Step, the Trustees petitioned the court for authority to use the major share of the proceeds of the sale to MBTA to finance an interim tender offer to redeem the Debtor's First Mortgage bonds at a discount. In 1979 the Trustees were authorized to use $33.06 million (of the $39.5 million proceeds of the sale to MBTA) to acquire (at the discounted price of $800 per bond) the First Mortgage Bonds of B & M and accrued

---

7. Before this plan was filed in 1975, the court was required, within 120 days following January 2, 1974, to determine under the general provisions of Section 207(b) of the Regional Rail Reorganization Act of 1973, Pub.L. No. 93–236, 87 Stat. 985, whether B & M should continue under the reorganization provisions of Section 77 of the former Bankruptcy Act (11 U.S.C. § 205) or be subject to reorganization under the Regional Rail Reorganization Act. The court held on May 2, 1974 that the public interest would be better served by continuing B & M under the present reorganization proceedings. *In re Boston and Maine Corporation,* 378 F.Supp. 68 (D.Mass.1974).

unpaid interest thereon. The tender offer resulted in the acquisition and retirement of $36,992,000 principal amount of the bonds, thus reducing the amount of principal indebtedness of the bonds outstanding to $9,944,976 and increasing the Debtor's net worth.

A significant move directed toward ultimate reorganization was initiated by the Trustees in 1978 when they sought and were granted authorization to enter into a financing agreement with Federal Railroad Administration ("FRA") for rehabilitation of B & M's main line between Ayer, Massachusetts and Mechanicville, New York. Under the agreement dated September 29, 1978, FRA loaned the Trustees $26.0 million in cash in exchange for Trustees' certificates of indebtedness in the face amount of the loan. The rehabilitation was completed in 1981, resulted in a major rebuilding of B & M's heaviest density line and upgraded the line, in large part, to Class IV standard.

The amendment to the 1975 Plan that was filed with the court on December 31, 1980 was transmitted to the Commission which established a schedule of proceedings for consideration of the Plan as then most recently amended. Before any consideration was given to the Plan under the schedule, the Trustees had concluded certain negotiations with Timothy Mellon of Guilford, Connecticut, which resulted in the execution of a "Letter of Intent" on April 15, 1981 concerning the acquisition of B & M by Guilford Transportation Industries, Inc.[8] On July 15, 1981 the Letter of Intent was superseded by an Acquisition Agreement entered into by the parties. It is sufficient to note here, in concluding this brief history of the reorganization proceedings, that the Acquisition Agreement contemplates that Guilford will become owner of all of the outstanding new Common Stock and assume control of the reorganized B & M.

## II

Soon after reorganization proceedings were commenced, the Trustees began an abandonment study of lines that were unprofitable in operation. A number of branch lines were operating at very low traffic density at out-of-pocket loss. Some of the branches had been receiving little or no maintenance and if continued in operation B & M would have had to restore the lines to normal maintenance condition at heavy expense. The Trustees sought and were given authority to abandon freight service over approximately 280 miles of lines. Approximately 65 additional miles of lines are or may become the subject of further abandonment petitions.

Presently, B & M operates over approximately 1416 miles of owned or leased track in the states of Massachusetts, Maine, New Hampshire, Vermont, Connecticut and New York. B & M is primarily a carrier of freight, but, as noted above, it also operates commuter rail service from Boston's North and South Stations for the account of MBTA.

B & M's main line runs east/west from Rotterdam Junction, New York through Mechanicville, New York to Ayer, Massachusetts, a distance of 165 miles. At Mechanicville there is an interchange with the Delaware and Hudson Railroad ("D & H"), and at Rotterdam Junction B & M interchanges traffic with ConRail. That portion of the main line between Fitchburg and Greenfield, Massachusetts, approximately 56 miles, is leased by B & M from the Vermont and Massachusetts Railroad under a 999-year lease. As already mentioned, this east/west main line is maintained at Class IV standard.

B & M operates over the 118-mile line between Ayer and South Portland, Maine

**8.** Guilford Transportation Industries, Inc. was organized as a corporation under the laws of Delaware in 1981. Timothy Mellon is the owner of all or substantially all of the common stock of Guilford, which is owner and holder of all of the outstanding stock of Maine Central Railroad Company ("MEC") and in control of MEC. Guilford recently has acquired conditionally all of the outstanding common stock of Delaware & Hudson Railroad ("D & H"). Guilford is a holding company with substantial investments in railroad properties which it controls and proposes to manage.

where it interchanges traffic with the Maine Central Railroad through the Portland Terminal Company. The 13-mile portion of this line between Willows and North Chelmsford, Massachusetts, is leased by B & M from Stony Brook Railroad Company (in which B & M owns a controlling, 60% interest) under a lease that expires in 1989. This line is maintained at Class III standard.

The Connecticut River Line of B & M lies between Springfield, Massachusetts and Wells River, Vermont, a distance of 164 miles, and is maintained at Class III standard. This line makes a junction with B & M's east/west main line at East Deerfield, Massachusetts. The line continues northerly from the junction through Greenfield, Massachusetts to Bellows Falls, Vermont where it connects with the Central Vermont Railroad (a subsidiary of the Canadian National Railroad) and continues still northerly to White River Junction, Vermont, thence to Wells River, Vermont and Whitefield, New Hampshire, and ultimately to Berlin and Groveton, New Hampshire where the line connects with the Canadian National Railroad ("CN"). The Central Vermont Railroad ("CV") owns approximately 14 miles of the Connecticut River Line between White River Junction and Windsor, Vermont, and 11 miles between Brattleboro and East Northfield, Vermont, and CV has granted trackage rights to B & M over these portions of the line. At White River Junction there is a traffic interchange with CV; at Woodsville, Vermont near Wells River, there is a traffic interchange with CN; and at Whitefield, a connection with the Maine Central Railroad. Using B & M crews, Amtrack operates one "Montrealer" passenger train per day in each direction over the Connecticut River Line.

B & M operates its New Hampshire Line approximately 45 miles from North Chelmsford, Massachusetts to Concord, New Hampshire and serves the principal New Hampshire cities of Concord, Manchester and Nashua. This line is maintained at Class III standard.

In addition, B & M operates several light density freight lines. The most significant of these may be described as follows:
(a) The Groveton and Berlin Branch connecting the James River Corporation plant in Berlin and the Groveton Paper Company plant in Groveton to the Connecticut River Line at Wells River. (The Berlin Mills Railway, a short line, operates the Berlin Yard for B & M.)
(b) The Conway Branch running north from the Ayer/Portland line at Rollingsford, New Hampshire to Ossipee, New Hampshire.
(c) The Ashuelot Line connecting Keene, New Hampshire with the Connecticut River Line at Brattleboro. (The Green Mountain Railroad, a short line, operates the Keene Yard for B & M.)

The commuter rail service, which B & M operates for the account of MBTA from Boston's North and South Stations, is a very important passenger service. MBTA owns or leases the equipment used in the commuter service, and B & M supplies all of the operating and supporting personnel. Operations under the agreement with MBTA for commuter rail service represent almost one-third of B & M's activity as measured by the operating expenses.

In December of 1981, the court by Order No. 629 authorized the Trustees to purchase from ConRail certain railroad lines, rights and properties located in Connecticut and western Massachusetts and assume the freight service obligations of ConRail appertaining thereto. The Trustees also obtained trackage, operating and reciprocal switching rights over approximately 93 miles of track, and trackage rights over approximately 3.1 miles of track, in Massachusetts and Connecticut, in order to facilitate operations over the railroad lines acquired from ConRail.[9]

9. Order No. 629 specifically authorized the Trustees to purchase certain lines, amounting to approximately 164.5 miles of track, which serve the following towns and cities (a) in Massachusetts: Pittsfield, North Adams, North Adams Junction, and Springfield; and (b) in Connecti-

## III

The First Step of the Trustees' 1975 Plan had been fully achieved when the July 15, 1981 amendment, which reflected Guilford's proposal to acquire control of B & M, was filed with the Commission and the court.

In the July 15, 1981 amendment the Trustees proposed measures by which they expected both to satisfy claims of creditors and to revise the capitalization of B & M. The Trustees submitted to the Commission their so-called "Amended Plan", incorporating the amendment of July 15, 1981; and subsequently the Trustees submitted an additional amendment which they filed with the Commission on March 3, 1982. The Commission approved the final version of the plan with all amendments thereto.

### A

The Amended Plan provides for a revision of the capitalization of B & M by cancelling the presently outstanding preferred and common stock, and by authorizing the creation of new capital stock as follows:

(a) 3,000,000 shares of new Common Stock of the par value of $1 per share, and

(b) 2560 Redeemable Preference Shares, Series A, and 40 Redeemable Preference Shares, Series B, of the par value of $10,000 per share.

The Plan calls for issuance to Guilford of all of the outstanding new Common Stock, that is, a total of 2,425,000 shares, in consideration of Guilford's payment of $24,250,000 in cash to the reorganized B & M.

Thus the Plan does not call for issuance at this time of the full number of shares of new Common Stock authorized. The Plan also provides for issuance of all 2600 Redeemable Preference Shares to the United States Government in exchange for the Trustees' certificates of indebtedness of $26.0 million, issued in 1978 for the loan made by FRA to the Trustees. No dividends or payments of principal will be due on the Redeemable Preference Shares prior to 1989. It is provided under section 3.1(1) of the Plan that the holders of the new Common Stock, in the event of liquidation or winding-up of the reorganized B & M, shall be entitled to receive $10 per share out of the assets available for distribution to stockholders before any distribution is made to holders of Redeemable Preference Shares. The holders of the Redeemable Preference Shares would then be entitled to receive the par value of their shares before further distribution would be made to holders of the new Common Stock.[10]

Preference Shares Series A will issue in an amount equivalent to loans made by FRA for the elimination of deferred maintenance of B & M's main line, and the annual dividend payable, commencing in 1989, on such shares will be at the rate of 4.2 percent per annum on the outstanding par value of such shares. Preference Shares Series B will issue in an amount equivalent to loans made by FRA for work deemed by FRA not to constitute deferred maintenance, and the annual dividend payable, commencing in 1989, on such shares will be at the rate of 8.89 percent per annum on the outstanding par value of

cut: Canaan, Hazardville, Plainville, Avon, Waterbury, Hartford, New Haven, Bloomfield, Wethersfield, Berlin, New Britain, Highland Junction, Watertown, and Torrington. One such line, that between Waterbury and Torrington, was, however, subsequently conveyed to the State of Connecticut. Order No. 629 also authorized the Trustees to obtain trackage and/or operating and reciprocal switching rights over certain lines and in a rail yard which serve or are located in the following towns and cities (a) in Massachusetts: North Adams Junction, Pittsfield, and Springfield; and (b) in Connecticut: Hazardville, Bloomfield, Griffins, New Haven, Waterbury, Derby, Wethersfield, Rocky Hill, and Hartford. The expansion of operations

contemplated in Order No. 629 afforded B & M opportunities, *inter alia,* to develop connections and cooperation with the Long Island Rail Road. Nevertheless, it is important to note, in this regard, that the Commission, in reaching its decision to approve the Trustees' Amended Plan, did not, when calculating revenues of B & M, "include income associated with these acquisitions" of lines in Massachusetts and Connecticut. *See* I.C.C. Decision at 22, n.d.

**10.** Additional designations, preferences, rights, qualifications and limitations concerning the Redeemable Preference Shares are set forth in Exhibit I of the Amended Plan.

such shares. Series A shares will receive annual "level service" payments of $750 (the dividend plus the mandatory redemption installment) per share commencing in 1989 and payable to 2008, when the shares will be fully paid out. The annual "level service" payments from 1989 to 2008 on Series B shares will be at the rate of $2547.22 per share.

### B

The reorganized B & M will be authorized under the Amended Plan to issue Certificates of Contingent Interest (CCIs) in four series, designated in order of priority Series: A, B, C and D.

Series A CCIs may be issued in the aggregate face amount by which the amount of cash available may be found insufficient on the Consummation Date to satisfy fully the claims of the holders of the Income Bonds.

Series B CCIs may issue in the aggregate amount equal to the face value of all claims of the United States arising under Title 31 U.S.C. § 191.[11]

Series C CCIs may issue in the aggregate face amount equal to all tax claims, which have not been waived and which are not secured by valid liens of federal, state and local taxing authorities, that are found to be based on valid assessments and to have become legally due and owing within three years preceding March 12, 1970, or otherwise entitled to priority under the Bankrutpcy Act.

Series D CCIs may issue in the aggregate face amount equal to ten percent of the total principal amount of liquidated and allowed claims of general unsecured creditors.

The holders of the CCIs will be entitled to receive payment of the face amount, without interest, of the CCIs *only* from the cash in the Segregated Account [12] that is in excess of the amounts needed for payment of senior claims. CCIs will be payable in order of priority among the four series, and *pro rata* within each series, in whole or in part, from time to time when it is determined by the Trustees that excess cash is available. To the extent that CCIs have

---

**11.** *See In re Tennessee Central Railway Company,* 463 F.2d 73 (6th Cir.), *rehearing en banc denied, cert. denied,* 409 U.S. 893, 93 S.Ct. 122, 34 L.Ed.2d 150, *rehearing denied,* 409 U.S. 1029, 93 S.Ct. 459, 34 L.Ed.2d 323 (1972).

**12.** The Amended Plan calls for the establishment of the Segregated Account in section 3.3 which provides, in relevant part, that:

Cash from the following sources shall be deposited in the Segregated Account as follows:

(i) proceeds of the so-called Boston Garden Mortgage presently held by the Trustee for the First Mortgage Bonds and all cash, certificates of deposit and other cash equivalents on deposit as of the Consummation Date with approved depositories in restricted accounts, including proceeds of other sales or condemnations of property between the date of this New Plan and the Consummation Date shall be deposited in the Segregated Account as of the Consummation Date; provided, however, that if the remaining proceeds of the Concord-to-Lincoln taking by the State of New Hampshire in 1975 (in the amount of approximately $427,000) or the proceeds of the Somerville taking of 1967 are received subsequent to the Consummation Date, such proceeds, less the expenses of prosecuting and settling such takings, shall be deposited in the Segregated Account at such time as they are received; and provided further that any proceeds in excess

of $500,000 in the aggregate from any sales or condemnations of property (other than the Concord-to-Lincoln and Somerville takings referred to above and other than the sales specifically described in Part 2 of Schedule E of the Acquisition Agreement) between the date of this New Plan and the Consummation Date shall be paid to the reorganized Company, shall not be deposited in the Segregated Account and shall be excluded in computing the balance in Accounts Nos. 701 and 702 in accordance with clause First of Subsection (2) of this Section 3.3;

(ii) such amount, if any, of cash or cash equivalents of the Debtor in Accounts Nos. 701 and 702 as of the Consummation Date or December 31, 1981, whichever shall occur first, as is in excess of $5,250,000 shall be deposited in the Segregated Account as of the Consummation Date; provided, however, that such excess amount, if any, shall be deposited in a restricted account as of December 31, 1981, if the Consummation Date has not occurred; and

(iii) cash in the amount of $24,250,000 to be provided by Guilford pursuant to the Acquisition Agreement shall be deposited in the Segregated Account as of the Consummation Date.

Cash in the Segregated Account shall be invested to the extent practicable as permitted by Rule 8–505 of the Bankruptcy Rules.

not been paid in full within five years after the date of consummation of the Plan, such CCIs will be cancelled automatically and the holders thereof will have no further claims against the reorganized B & M for the unpaid balance of such CCIs.

### C

The claims against the Debtor's estate that have been acknowledged by the Trustees are as follows:

| | | |
|---|---|---|
| (a) | Administration claims | $ 3,000,000 |
| (b) | Tax-lien claims | 8,600,000 |
| (c) | Claims of Six Months creditors [11 U.S.C. § 205(b)] | 3,000,000 |
| (d) | First Mortgage Bonds, principal and accrued interest | 17,655,000 |
| (e) | Income Bonds, principal and accrued interest | 37,276,000 |
| (f) | Claims of the United States under 31 U.S.C. § 191, and State of New Hampshire Public Utilities Tax | 40,000 |
| (g) | Claims of general unsecured creditors | 15,050,000 |
| (h) | 5% Preferred Stock ( shares) | — |
| (i) | Common Stock ( shares) | — |
| | | $ 84,621,000 [13] |

The Trustees had on deposit in their Restricted Funds Account (Account No. 716) as of June 30, 1982 the sum of $47,970,771. The funds in this account are comprised mostly of the proceeds of sales of property of the Debtor, subject to the liens of the First Mortgage Bonds and Income Bonds, and the interest accrued from investment of the proceeds. The $47,970,771 was exclusive of the Debtor's current cash and cash equivalents in Accounts No. 701 and No. 702, and the special deposits in Account No. 703.[14]

Under the Plan, $5,250,000 of the cash in Accounts No. 701 and No. 702 on the Consummation Date will be paid over to the reorganized B & M. To the extent that the cash in those two accounts is less than $5,250,000 the deficiency shall be paid from the Segregated Account to the reorganized B & M before any cash is distributed to creditors.

Assuming consummation of the Plan had occurred on June 30, 1982, the Trustees would have distributed the available cash consisting of the $47,970,771 in Account No. 716 and the $24,250,000 to be paid by Guilford for the new Common Stock, a total of $72,220,771.[15] This sum would have been adequate to pay the amounts allotted to the classes of claims listed above, except for the following: (g) the general unsecured claims; and (h) and (i), any amount on the presently outstanding preferred and common stock.

The Plan provides that the claims of the general unsecured creditors will be satisfied by the issuance of Series D CCIs in the aggregate face amount equal to ten percent of the total liquidated and allowed claims. There are no provisions in the Plan for payment of any cash, or issuance of any options or warrants to acquire securities of the reorganized B & M, to the holders of presently outstanding preferred and common stock. Instead, the Trustees request in section 3.10 that the Commission find and the court affirm that such stock has no value.

The cash of the Debtor available for distribution to the creditors will be paid in the order of priority set out in section 3.3(2) of the Plan—the order set forth in the above listing. In section 3.9 of the Plan it is provided that any cash remaining in the Segregated Account after making the cash payments to claimants as required by sec-

---

**13.** The Trustees' certificates of indebtedness in the amount of $26,000,000 will, under the Plan, be exchanged for the 2600 Redeemable Preference Shares, as noted above, and, consequently, are excluded in the list of claims here.

**14.** The net balance of funds on deposit on June 30, 1982, in these three accounts totals $6,610,098.

**15.** In their response filed August 11, 1982 to the court's Order No. 675, the Trustees estimate that the amount of available cash for distribution to creditors will probably be $75.5 million at the end of 1982.

tion 3.3 shall be paid over to the reorganized B & M as additional working capital.

## D

The Trustees, in section 4.1 of the Plan, expressly affirm the leases (as of March 12, 1970) of the properties of The Northern Railroad, the Stony Brook Railroad, and the Vermont and Massachusetts Railroad, including the amendments in each lease. A schedule of the executory contracts that will be assumed by the reorganized B & M has been filed with the court as provided in section 4.2. Other executory contracts, which the Trustees have rejected as of March 12, 1970, as provided in section 4.3, are identified in an Exhibit filed with the court.

As of the Consummation Date all of the property remaining in the Debtor's estate will, as provided in section 4.5 of the Plan, be transferred and conveyed to the reorganized B & M free and clear of all claims of creditors and stockholders of the Debtor.

## IV

Pursuant to Section 77(e), the court, by order entered July 7, 1982, (A) fixed the time within which (1) objections to the Amended Plan certified by the Commission, (2) claims for equitable treatment, and (3) statements of position, might be filed with the court; (B) established August 11, 1982 as the date of hearing of the objections and claims; and (C) provided for the giving of due notice of the hearing by the Trustees to creditors, stockholders and all other parties in interest. Notice of entry of the July 7 order was given by the Trustees in accordance with the directions of the court contained therein. Objections to the

Amended Plan were filed pursuant to the order, and there were also filed claims for equitable treatment and statements of position. Among the responses filed was the motion of Canadian Pacific Ltd. ("CP") requesting that the court defer decision on the question of approval of the Amended Plan until such time as the Court of Appeals for the District of Columbia Circuit decided certain petitions for review of the Commission's decision approving the Trustees' Amended Plan (the plan presently before the court in this proceeding).

The hearing, pursuant to order entered July 7, was held on August 11 and 12, 1982, at which all parties in interest were afforded opportunity to be heard in support of and opposition to the objections and claims for equitable treatment, and in support of and opposition to the motion of CP. The parties who appeared and argued to the court on the objections, claims or the motion of CP are identified in the margin.[16] The hearing was closed after the conclusion of the oral arguments and after the court fixed August 23, 1982 as the time within which a party in interest might file a memorandum on the issues raised before the court during the hearings.

On August 26, 1982 the court, on its own initiative, entered an order giving notice of the reopening of the hearing, and scheduling a further hearing to be held September 16, 1982 for the limited purpose of receiving evidence of "the approximate amounts to be paid by the Debtor [or by any corporation or corporations acquiring the Debtor's assets] for expenses and fees incident to the reorganization" in accordance with the provisions of Section 77(e)(2). Notice

---

**16.** The following parties appeared at the hearing and addressed the court on the matters in question: the Trustees of the Debtor (by Charles W. Mulcahy, Jr., Counsel, and by Robert M. Gargill, Special Counsel); Guilford Transportation Industries, Inc. (by James E. Howard, Counsel); the First Mortgage Trustees (by Joseph H.B. Edwards, Counsel); the Second Mortgage Trustees (by Joseph D.S. Hinkley and Linda D. Chase, Counsel); the Interstate Commerce Commission (by John J. McCarthy, Jr., Office of the General Counsel); the Federal Railroad Administration, United States Department of Transportation (by G. Joseph King, Special Counsel); the City of Cambridge (by Steven B. Levine, Counsel); the State of New York (by James A. Arpante, Office of the Attorney General of the State of New York); Penn Central Corporation (by Ellen Poster, Special Counsel); the Chesapeake and Ohio Railway Company, Baltimore and Ohio Railroad Company, and Western Maryland Railway (by John T. Collins, Counsel); the Maine-New Hampshire Interstate Bridge Authority (by John T. Collins, Counsel); the Canadian Pacific Ltd. (by Charles H. White, Jr., Counsel).

of entry of the August 26 order was given by the Trustees to all persons who rendered services and incurred expenses incident to the reorganization, in accordance with the directions of the court set out in the order. The order provided that any person seeking compensation and reimbursement for expenses incident to the reorganization might, in lieu of presenting oral evidence at the hearing, file with the court a statement of the services rendered, or to be rendered, and the expenses incurred, substantially in the manner and form of the statement required by Bankruptcy Rule 8–212(a). The persons who appeared at the hearing and addressed the court in response to the matters contained in the order or who filed statements with the court are identified in the margin.[17]

Thus the record of the proceedings on the question of approval of the Amended Plan demonstrates that all parties in interest have had an opportunity to be heard, and that all classes of creditors and stockholders have had an opportunity to present their claims and argue the same to the Commission and to the court.

Section 77(d) provides that if the Commission approves a plan, it shall certify to the court the plan "together with a transcript of the proceedings before it and a copy of the report and order approving the plan". In the Commission's decision in this case, the Commission noted that it had consolidated for concurrent disposition the

Amended Plan and Guilford's application (filed October 28, 1981) for authority to control B & M, the Commission stating it did so "[i]n view of the interrelationship between the control application and the . . . Amended Plan". (I.C.C. Decision at 5). The record and transcript certified to the court comprise the complete record and transcript of the consolidated proceedings before the Commission on the Amended Plan and the control application. The record contains written verified statements of witnesses offered on direct evidence on the Plan and control application, and on "responsive applications" filed by other parties, and testimony developed under cross-examination of witnesses at public hearings before an Administrative Law Judge. The testimony of some witnesses in the record relates only to the control application, and the testimony of other witnesses relates to both the Amended Plan and the control application. The consolidated record was not separated as between the Plan and the control application. While recognizing that "an integral relationship exists between [Guilford's] control of B & M and that carrier's reorganization",[18] the Commission made clear the basis of its decision to approve the Plan, as follows:

We are approving the Amended Plan of Reorganization because it satisfies the requirements of section 77(b) and (e) of the former Bankruptcy Act and is compatible with the public interest. The Trustees have established the viability of

---

17. The following persons filed statements with the court pursuant to the order of August 26, 1982 and addressed the court on September 16, 1982: Robert W. Meserve and Benjamin Lacy, Trustees of the Debtor; Charles W. Mulcahy, Jr., Counsel for the Trustees of the Debtor; Robert M. Gargill, Special Counsel for the Trustees of the Debtor; Joseph H.B. Edwards, Counsel for the First Mortgage Trustees; Edward T. Robinson, Counsel for the Madison Fund; James E. Howard, Counsel for Guilford Transportation Industries, Inc.; Philip W. Burling, Counsel for the Group of Institutional Bondholders. The following persons filed statements pursuant to the order but did not address the court at the hearing in question: Charles H. White, Jr., Special Counsel for the Trustees of the Debtor; Joseph D.S. Hinkley, Counsel for the Second

Mortgage Trustees; Howard C. Westwood and Lewis H. Weinstein, Counsel for the Group of Institutional Bondholders; Charles C. Shannon, Consultant to the Group of Institutional Bondholders; John T. Collins, Counsel for the Chesapeake and Ohio Railway Company, Baltimore and Ohio Railroad Company, and Western Maryland Railway; George W. McLaughlin, Counsel for Canadian Pacific Ltd.

James E. Howard on behalf of Guilford expressly stated that Guilford did not seek to be paid any fees or reimbursed for any expenses for services rendered incident to the reorganization. (Court Tr. Aug. 12, 1982, 2–19, 2–20).

18. It is contemplated that under Guilford's control the reorganized B & M will remain a separate corporate entity. (I.C.C. Decision at 4).

a reorganized B & M on the basis of its realistic earning potential.

(I.C.C. Decision at 4).

## V.

■ Section 77 contemplates that "[t]he judicial functions of the [reorganization] court and the administrative functions of the Commission [will] work cooperatively in reorganizations". (Footnote omitted). *Warren v. Palmer*, 310 U.S. 132, 138, 60 S.Ct. 865, 867, 84 L.Ed. 1118 (1940). Section 77(e) in part provides that upon certification of the plan by the Commission, the judge, after hearing, shall "approve the plan if satisfied that ... [i]t complies with the provisions of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders ...". In reviewing the plan, "[t]he power of the court does not extend to participation in all responsibilities of the Commission. Valuation is a function limited to the Commission, without the necessity of approval by the court.... The function of valuation thus left to the Commission is the determination of the worth of the property valued, whether stated in dollars, in securities or otherwise". *Ecker v. Western Pacific R. Corp.*, 318 U.S. 448, 472, 63 S.Ct. 692, 707, 87 L.Ed. 892 (1943). While it is clear that the statutory scheme vests in the Commission (and not in the court) the determination of value of the property on which the plan of reorganization depends, it remains for the reorganization court to ascertain, within the statutory scheme, whether the Commission's determination is supported by material evidence and is in accordance with legal standards. *Id.* at 477, 63 S.Ct. at 709. So long as the record demonstrates both (1) the requisite support for the Commission's findings of fact and conclusion on valuation and (2) the application of correct principles by the Commission in reaching its findings and conclusion, it is not the function of the court to reexamine those findings or that conclusion.

The statutory provisions for valuation of a railroad in reorganization are set forth in Section 77(e) (¶ 4):

If it shall be necessary to determine the value of any property for any purpose under this section, the Commission shall determine such value and certify the same to the court in its report on the plan. The value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts.

Under the Amended Plan, the value of the reorganized B & M consists in the expectation of income from its use of productive property. In such case the earning power of the property is the primary factor in determining the value of the enterprise as an operating railroad. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 539–40, 63 S.Ct. 727, 737–38, 87 L.Ed. 959 (1943); *Ecker v. Western Pacific R. Corp., supra* 318 U.S. at 507, 63 S.Ct. at 723. "The extent and method of inquiry necessary for a valuation based on earning capacity are necessarily dependent on the facts of each case." *Consolidated Rock Co. v. Du Bois*, 312 U.S. 510, 527, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941).

### A

The Commission's determination of the value of the reorganized B & M is about $24,250,000. (I.C.C. Decision at 24). *See Ecker v. Western Pacific R. Corp., supra* 318 U.S. at 481, 483, 63 S.Ct. at 711, 712. The Commission had before it evidence pertaining to past operating revenues and in-

come, the system's physical restructuring and condition, improvements at the management level, and forecasts to 1985 of tonnage, revenues, expenditures, and income. Overall there was adequate evidence of relevant future earning power of the reorganized B & M, and, in addition, there were opinions of value of the reorganized B & M given by witnesses called by the Trustees. The Commission found that the Trustees have established the requisite viability of the reorganized B & M on the basis of its realistic earning potential, *id.* at 19, having found that the record establishes that the reorganized B & M will produce sufficient earnings to justify approval of the Amended Plan.[19]

The Amended Plan calls for a *pro forma* capitalization of the reorganized B & M totalling $60,525,000, as of January 1, 1982, comprised of total debt of $10,275,000 and total shareholder's equity of $50,250,000. The debt portion consisted of equipment obligations in the amount of $1,106,000, and capital leases of $9,169,000. Shareholder's equity included the $26 million of Redeemable Preference Shares, and $2,425,000 allocated to 2,425,000 shares of new Common Stock (of $1 par value per share) and $21,825,000 to paid-in capital.

The *pro forma* capitalization reflects the elimination of the Debtor's mortgage debt and the conversion of the Trustees' Certificates, previously delivered to FRA, into the subordinated Redeemable Preference Shares, and demonstrates that upon consummation of the Amended Plan the reorganized B & M will commence business with an unusually low amount of funded debt.

■ In computing the annual fixed charges of the reorganized B & M, the Commission used the $11.1 million estimate of Mr. Guest for equipment obligations, "rather than the $10,275,000 figure originally presented by the Trustees", (I.C.C. Decision at 20, n. 14), and added to that

estimate Guilford's loan of $1.5 million to the Trustees for acquisition and rehabilitation of ConRail lines in Massachusetts and Connecticut. Thus the total funded debt used in this computation would amount to $12.6 million. The evidence justified the Commission's use of the increased amount of funded debt, which use was viewed by the Commission as constituting a "conservative approach". Nevertheless, the substantial reduction overall in funded debt that would be effected by consummation of the Amended Plan would result in a decrease of annual fixed charges from approximately $3.07 million in 1981 to no more than $1.3 million after reorganization. The Commission's finding that the Amended Plan adequately provides for coverage of the annual fixed charges of the reorganized B & M by the probable earnings available for the payment thereof is supported by material evidence and comports with correct principles.

■ The Commission's judgment that B & M's value for purpose of reorganization is about $24,250,000 likewise is supported by material evidence and accords with legal standards. Thus Guilford's cash purchase of the total common equity of the enterprise for $24,250,000 represents an amount which is equivalent to the valuation found by the Commission. *Ecker v. Western Pacific R. Corp., supra* at 483, 63 S.Ct. at 712 ("[T]he determination by the Commission of the aggregate amount of securities which may be issued against the system is in substance a finding of total value for reorganization purposes."). It is clear from the record that B & M's value for purpose of reorganization would not support a capitalization which would justify issuance of securities in addition to the new Common Stock purchase by Guilford. The court concludes upon all the evidence that the amount to be paid by Guilford is a fair

---

**19.** The record demonstrates that the forecasts of the Trustees relating to future earning power of the reorganized B & M do not include estimated revenues expected from affiliation with MEC, nor estimated revenues resulting from the operation of properties acquired from ConRail.

Furthermore, in her determination of the going concern value of the reorganized B & M, Isabel H. Benham, the Trustees' witness, did not factor into her calculations any potential earnings from those sources.

price for the total issue of 2,425,000 shares of new Common Stock.

The Commission concluded that the provisions of the Amended Plan for distribution of (1) the total of the cash in the Trustees' Restricted Funds Account plus $24,250,000 of cash to be paid by Guilford for the new Common Stock, and (2) the CCIs, as required, to various classes of creditors, are in accordance with the rule of absolute priority. *North Pacific Ry. Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); and *Case v. Los Angeles Lumber Products Company*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). Classification of creditors and the order of their priorities were established by orders of the court, entered March 19, 1979 (Order No. 398) and April 19, 1982 (Order No. 637). Order No. 637 provided for a separate classification of general unsecured creditors, and defined their qualifications for membership in the class ("six months" claimants). The Order provided that the priority of the class shall be immediately junior to administration claims and secured tax claims, but senior to all other claims, including those of bondholders. Order No. 637 was entered after the Trustees had filed their plan, and amendments, containing the description of "six months" claims in section 1.19. To the extent that any inconsistency exists between the provisions of section 1.19 and Order No. 637, the court will modify the Amended Plan to conform with Order No. 637 "in order to carry out the plan effectively". (I.C.C. Decision at 60). The court agrees with the Commission that the distribution of the cash and CCIs under the provisions of the Amended Plan accords with the rule of absolute priority.

In accordance with the Trustees' request contained in section 3.10 of the Amended Plan, the Commission found that there is no value in the equity of the present ly outstanding common and preferred stock of the Debtor. This conclusion follows from (a) the Commission's determination of the value of the reorganized B & M at about $24,250,000, and (b) the fact that the proposed distribution under the Amended Plan of cash and CCIs will be insufficient to satisfy in full the claims of all creditors. Among others, the general unsecured creditors of the Debtor to the full extent of their debts are entitled to priority over the rights of stockholders in the property of the Debtor. *Kansas City Terminal Ry. Co. v. Central Union Trust Co.*, 271 U.S. 445, 455, 46 S.Ct. 549, 551, 70 L.Ed. 1028 (1926). Furthermore, the Commission determined that the value of the B & M for purpose of reorganization does not justify the issuance of options or warrants to creditors or stockholders to receive, or subscribe for, the new Common Stock of the reorganized B & M. The court is satisfied from the record that the foregoing finding and conclusions of the Commission are supported by material evidence and are in accord with correct principles.

Under Section 77(d) the Commission is charged with the primary responsibility of determining whether the Amended Plan is compatible with the public interest. *Ecker v. Western Pacific R. Corp., supra* 318 U.S. at 473, 63 S.Ct. at 707. In 1967 (almost three years before the petition for reorganization was filed) the Commission recognized the importance of B & M, as a railroad system, "to New England and the national rail system". The Commission has reiterated that recognition in its decision in these proceedings,[20] thus emphasizing the regional and national importance of the B & M system. Moreover, the Commission has expressly found that the Amended Plan is compatible with the public interest.

---

20. At 24–25 of its decision in this case, the Commission said:

We have previously recognized the importance of B & M to New England and the national rail system:

B & M is an important carrier between points in Massachusetts, Maine, New Hampshire, and Vermont, on the one hand, and points in southern New England, the mid-Atlantic States, the South, and the Midwest, on the other, thus providing a necessary transportation link in the national transportation system.

*Norfolk & W. Ry. Co. and New York C. & St. L.R. Co. Merger*, 330 I.C.C. 780, 794 (1967).

In the proceedings before the Commission, all of the states in which the Debtor operates (except Vermont, which took no position on the Amended Plan) gave their support to the Plan. In its consideration of the record before it, the Commission found that the reorganized B & M will *not* be a new system, "having only a speculative prospect for continued life" (I.C.C. Decision at 20, n. 13), but, rather, that Guilford "has evinced an unequivocal commitment to operate B & M for a long term". *Id.* at 19. The Commission noted that "B & M's affiliation with MEC and [Guilford]—which is an integral part of the reorganization—should entail substantial positive benefits for the reorganized entity" (*id.* at 21), and stated that the reorganized B & M "will remain the same railroad presently being operated, with additional traffic and competitive opportunities arising from affiliation with MEC and its recent acquisition of Conrail [*sic*] properties". *Id.* at 20, n. 13.

Thus after reviewing the Commission's findings on (1) the viability of the reorganized B & M, (2) the amount and character of its conservative capitalization, and (3) the reorganized railroad's ability to make appropriate use of B & M's existing facilities and plant to meet the need of the public for an efficient and economical continuing transportation system serving New England and the national rail system, the court agrees that all such findings are adequately supported by the record, are in accord with legal standards and justify the conclusion of the Commission that the Amended Plan is compatible with the public interest.

 The findings and conclusions of the Commission demonstrate that, pursuant to Section 77(b)(5), the Amended Plan contains adequate means for its execution. The Amended Plan provides for the transfer of control of the productive operating properties, and other properties, retained by the Debtor, free and clear of all claims of stockholders and, except for $12.6 million of debt, free and clear of all claims of creditors. This transfer of control, under the Amended Plan, will be effected by cancelling all presently outstanding preferred and common stock of the Debtor, pursuant to amendments to be made to the Debtor's charter of incorporation, and by the issuance to Guilford for cash, the total authorized outstanding 2,425,000 shares of new Common Stock of the reorganized B & M. The Amended Plan also provides for the affirmation of the Debtor's leases of the properties of The Northern Railroad, the Stony Brook Railroad, and the Vermont and Massachusetts Railroad, operated in the Debtor's system, and the assumption by the reorganized B & M of certain executory contracts. The Amended Plan further provides for the rejection of other executory contracts, and leases.

As further means for its execution, the Amended Plan contains provisions for the distribution of cash and certificates of contingent interest, in accordance with the rule of absolute priority, for the satisfaction of claims of secured and unsecured creditors; and provisions for the satisfaction or elimination of existing liens, or other security, and for the curing of defaults. The Amended Plan also provides (a) for the conversion of Trustees' Certificates into Redeemable Preference Shares, (b) for the transfer of cash from the Segregated Account, in the approximate amount of $6 million, to the reorganized B & M to be used for working capital, and (c) for the discharge of the Debtor from all debts and liabilities to its creditors and stockholders.

 The record supports the conclusion of the Commission that the Amended Plan provides adequate means and resources for achieving reorganization of B & M, on a conservatively capitalized basis, as a financially viable operating railroad.

**B**

 Section 77(e) provides that submission of a plan to stockholders is not necessary if their claims have been found worthless by the Commission, "and the judge shall have affirmed the finding". As reported in its decision, the Commission found that the equity of the presently outstanding preferred and common stock of the Debtor has no value. In *Ecker*, the Supreme Court made clear that the require-

ment of the district court's affirmation of the Commission's action eliminating claimants having no equity in the debtor's properties "points to a wider scope of review than an inquiry as to whether statutory standards for valuation have been followed". 318 U.S. at 478, 63 S.Ct. at 710. Nevertheless, the wider scope of review "does not require an independent appraisal [by the court] of the valuation" found by the Commission and that "[t]he court properly affirms the Commission, when it finds no legal objection to the Commission's use of its own valuation to determine whether particular claimants are entitled to participate in the reorganization". *Id.* at 479, 63 S.Ct. at 710.

The court has found that B & M's value for purpose of reorganization is supported by material evidence and accords with legal standards, and the court has not been made aware of any reason why that finding should be reviewed. In view of the fact that Guilford will pay in cash an amount at least equal to the value of the reorganized B & M for all the authorized outstanding new Common Stock, issuance of additional new Common Stock to the present stockholders in satisfaction of their claims would not be justified. Furthermore, there is no requirement, constitutional or statutory, that stockholders are entitled to "immediately valueless" options or warrants to receive, or subscribe for, securities of a reorganized railroad. *Ecker v. Western Pacific R. Corp., supra* at 476, 63 S.Ct. at 709. Moreover, as the court has found, the Amended Plan provides for distribution of the value of B & M's assets for purpose of reorganization in accordance with the rule of absolute priority. Thus the court affirms the finding of the Com-

mission that the equity of the present stockholders has no value.

C

The motion of Canadian Pacific Ltd. requesting the court to defer decision on the question of approval of the Amended Plan, certified to the court here by the Commission, until such time as the Court of Appeals for the District of Columbia Circuit has reached a decision on certain petitions for review of the Commission's decision approving the Amended Plan, was denied by Order of the court on November 3, 1982. 46 B.R. 927. The Memorandum of the court stating the reasons for the denial was filed with the Order.

VI

The opposition to the Amended Plan before the court comes from the following: Providence and Worcester Railroad ("P & W"), CP, a group of state and local taxing authorities, a group of Six Months creditors, the State of New York,[21] the Maine-New Hampshire Interstate Bridge Authority,[22] and two stockholders. The Commission reported in its decision that the principal opposition to the Plan before the Commission came from P & W and CP, that no shareholders or unsecured creditors appeared to oppose the Plan, and that the other creditors—"secured creditors and the holders of priority 'six months claims'—appear satisfied with the plan and do not oppose it". (I.C.C. Decision at 17). The court has considered all objections and claims presented by those who appeared at the hearing, and by those who submitted

---

**21.** The State of New York ("State") filed objection to the Amended Plan for failure of the Plan to accord fair and equitable treatment to the State on account of its claim in the nature of a tax lien. After the hearing on the Plan on August 11 and 12, the Trustees petitioned the court for authority to compromise the claim. The compromise was never part of the Amended Plan, and will not be considered by the court on the question of the approval of the Amended Plan.

**22.** The Maine-New Hampshire Bridge Authority objected to the Amended Plan, and claimed eq-

uitable relief for rental and maintenance charges arising out of Debtor's use of the bridge which spans the Piscataqua River and connects Portsmouth, New Hampshire and Kittery, Maine. As in the case of the claim of the State of New York, after the hearing on the Plan on August 11 and 12, the Trustees petitioned the court for leave to compromise the claim, and, accordingly, the court will not consider the compromise at this time, because it was never part of the Amended Plan.

objections and claims but did not otherwise seek to be heard.

## A

P & W, after the August 11–12, 1982 hearing, filed a brief with the court in which it persists in opposing the Plan. The grounds of opposition are that the Commission disregarded the standard concerning cost of capital stated in *Chicago, Milwaukee, St. Paul Pacific Railroad Company, Reorganization,* 363 I.C.C. 17 (1980) (*"Milwaukee Road"*); that the Trustees' forecasts of future earnings are grossly overstated; that the reorganized B & M has no prospect of covering its fixed charges; that the Amended Plan does not allow for sufficient working capital; and that approval of the Amended Plan by the Commission violated the provision of the Constitution concerning uniform laws on the subject of bankruptcy. Article I, Section 8 (in the fourth clause) of the United States Constitution. All arguments except the last were presented to the Commission which addressed and rejected them.

 P & W is not a creditor of B & M, and appears to claim standing to oppose the Amended Plan on the subtle ground that it (P & W) possibly might become a creditor of a reorganized B & M. On the record before the court, the nature of such possibility is not only incalculable, but is too uncertain, indefinite and remote to qualify P & W as a party in interest, within the meaning of Section 77(e), entitled to file objections to the Plan certified by the Commission.

Assuming, *arguendo,* that the objections are properly here, nevertheless they must be found lacking in merit. The main thrusts of the objections are that (1) the Trustees' forecasts are overstated, and (2) even if they are not overstated, the Amended Plan of reorganization is not viable.

The Trustees' expert witness, Isabel H. Benham, concluded that the going concern value of the reorganized B & M is $24,158,000 based on (1) capitalization at 12 percent of the 1982–1985 average of the Trustees' forecasts of net revenues from railroad operations, plus (2) capitalization of income derived from other than rail operations, and (3) additions of asset values not presently producing earnings, with (4) deductions from the total of the foregoing of debt and other ongoing liabilities of the reorganized railroad. (Benham's Verified Statement, Appendix C). Miss Benham explained the earning power component [23] of her valuation of B & M, which she characterized as "an insolvent carrier" in bankruptcy, in her testimony before the Administrative Law Judge. John Guest, financial advisor to Guilford, testified to valuation of the reorganized B & M in the range of $15–18 million. (Com.Ex. C–62).[24] Thomas Dewey, Jr., witness for P & W, testified that he had no opinion of value of the reorganized B & M. (Com. Tr. 774).

Miss Benham's opinion of value was challenged by Dewey as a "gross overstatement" because her capitalization of earnings was based on the Trustees' forecasts, which he thought were "spectacularly at variance with the history in this case". (Com.Tr. 774). (Dewey agreed that he had made no independent analysis of the forecasts.) The record contains evidence that the information which provided the basis of the Trustees' forecasts was obtained by B & M's Marketing and Sales Department directly from B & M's rail customers. The forecasts focused on six major commodity groups that have been and are expected to be the backbone of B & M's freight business, and the probable market opportunities and traffic levels through 1985. Miss Benham made a detailed analysis of the projections and their bases, as shown in

---

**23.** When queried about B & M's "historical earnings record", Miss Benham responded that it is not the function of the Trustees to produce earnings but to rebuild the railroad's property through the income account, and that the B & M Trustees endeavored to upgrade the B & M "which was practically a scrap heap when the Trustees came on the property". She noted that

any bankrupt railroad operates at a deficit with income ploughed back into maintenance. (Com.Tr. 127–28).

**24.** All references to record of hearings and exhibits before the Commission are indicated: "Com.Tr." and "Com.Ex.", respectively.

Appendix D of her Verified Statement. Her view of the commodity mix overall is that it was "lackluster", but she concluded that "every effort has been made to make the projections as conservative as possible". She was of the opinion that the projections for 1982 may not be reached, "but we would expect 1985 tonnage results to be fairly close to the targets with the possibility of revenues substantially exceeding the forecasts". (Appendix D at 7). She reaffirmed this belief later in testimony that "in the five year period [the tonnage forecasts] will come out probably exactly where they say they are", and noted that B & M's downturn in 1981 carloadings was no different than that of the industry as a whole. She stated that B & M's tonnage and revenues are projected to grow at a compound annual rate of 1.5 percent and 1.2 percent, respectively, while operating expenses are estimated to increase at the rate of 0.6 percent, compounded annually. She found the Trustees' estimated cash flows adequate to cover annual debt maturities and capital expenditures, and she observed that "a high level of cash inflows over cash outflows are [sic] more indicative of ... viability and financial strength than reported earnings or other yardsticks ...". (Benham's Verified Statement at 13). According to Miss Benham, although coverage of fixed charges is "more than adequate", the margin of safety ratio for such charges is slim, suggesting "that revenues ... may be inadequate in relation to the cost of handling the traffic". Id. at 16–17. It was her view that "if the earnings and cash projections ... should not be realized ..., the conservative capitalization of the reorganized company suggests that external funding of capital requirements would be possible without jeopardizing the ICC fixed charge coverage yardstick of 3.5x". She concluded that:

> the Trustees' projections are conservative and that, if revenue forecasts turn out to be too optimistic, there is room in the expense accounts to compensate for any revenue decline because of the major rehabilitation programs projected to be charged to those accounts. Most important, the cash flow projections indicate that adequate debt protection exists and that sufficient sums will be generated internally to meet capital requirements over the first four years after consummation of the Plan.

Id. at 16–17.

John Guest gave testimony in support of the Amended Plan and the viability of B & M and Maine Central Railroad ("MEC") as components of Guilford's system. He contrasted B & M's ten years of deficits during 1970–1979 with the recent benefits to B & M brought about by the Trustees in management, advantageous commuter service contracts, rehabilitation of the main line, and relief from burdensome work rules in labor relations; and he noted that, absent the coal strike and expenditures for excessive maintenance, B & M would have reported net revenue from railway operations ("NRRO") of approximately $1.0 million in 1981. He observed that under the Amended Plan B & M will emerge from bankruptcy with a $12.6 million debt, "an unusually low amount of funded debt", and that his *pro forma* statements of income and cash flow, based on alternative assumptions of (a) NRRO at $2.5 million a year and (b) NRRO at $4.7 million a year (reflecting B & M's share of benefits from Guilford's common control of B & M and MEC), indicate that under normal economic conditions B & M should enjoy positive net income, and demonstrate both a satisfactory fixed charge coverage ratio and a high ratio of gross cash flow to total debt. He noted that in assessing viability of an enterprise it is necessary to consider both good years and bad years, and that "unusual adverse events such as the impact of a coal strike may appropriately be excluded ...". Turning to the feasibility of the Amended Plan, Guest concluded that the effect of the recession on B & M's recovery progress did not appear to daunt Mr. Mellon, who "testified ... that Guilford viewed B & M as a long range investment and [that he] continued to support the Trustees' plan, including the payment of $24,250,000 for the entire [issued] common stock of the reorganized railroad". (Guest's Verified Statement at 9).

Material evidence was presented to the Commission concerning the value of the reorganized B & M. It is true that in 1981 and 1982 earnings of the Debtor fell short of earnings predicted for those years by the Trustees, but, as the Commission found, the shortfall resulted in large part from unusual adverse conditions arising out of the continuing economic recession coupled with a coal strike and expenditures for excessive maintenance. There was adequate evidence to support these findings, and the weight to be accorded to the conditions referred to, and the conclusions reached, by the Commission are not subject to reexamination here. Moreover, there was in the record before the Commission additional evidence of factors relevant to future earning power of the reorganized B & M; thus the Commission was not bound to agree with P & W's argument that the Trustees' forecasts for 1982 through 1985 like a "house of cards must now come tumbling down". Nor was the Commission bound to accept P & W's estimate of the yield from B & M's contract with MBTA, or the adverse impact on B & M's revenues which P & W assumed would result from the Norfolk and Western-Southern ("NS") consolidation. The thrust of these arguments is not that the record was lacking in evidence to support the Commission's findings and conclusions; rather, it is that the Commission should have found facts as P & W preferred them to be.

It was for the Commission in the exercise of its fact-finding function, in considering evidence which arguably might have tended toward alternative conclusions, to determine future earning capacity of the reorganized B & M, its coverage of fixed charges, and the question of adequacy of its working capital. The findings and conclusions reached by the Commission lie within the limits of the evidence in the record, and the court, in reviewing the Commission's findings and conclusions, can see no reason to interfere with the discretion confided to the Commission to determine whether the evidence before it affords a reliable basis for its conclusions.

P & W contends further in its brief filed here that under the test stated in the Commission's decision in *Milwaukee Road* the reorganized B & M will not achieve, under the Trustees' forecasts, a rate of return equivalent to the railroad industry's cost of capital. P & W argues that such rate of return is a condition of approval of the Amended Plan.

In addressing this argument, the Commission stated:

The Trustees have established requisite viability of the reorganized B & M on the basis of its realistic earning potential. *Milwaukee Road* did not establish an absolute requirement that a reorganized railroad achieve a rate of return on total capitalization greater than the railroad industry cost of capital. Indeed, in *Milwaukee Road* we expressly refused "to develop a rate of return which would signify viability ... [ellipsis in text] since the rate could vary depending on the capital sources available to the system, the risk of the proposal, and the magnitude of public involvement." *Id.* at 48. We focused on the "hurdle" rate that would induce an investor to make the "new investment" in a "newly reorganized railroad." *Id.* at 49. And we noted that one of the principal reasons for ensuring that a reorganized carrier can achieve an adequate rate of return is that in the absence of such a return, it "would have great difficulty attracting outside capital, and would have a strong disincentive from reinvesting its own funds in the system." *Id.* at 45.

In this case the ultimate test of viability established in *Milwaukee Road* has already been met. In contrast to the involuntary investment in a reorganized railroad which shareholders of its non-railroad holding company were required to make under both of the Milwaukee Railroad reorganization plans, here an outside source of private capital—[Guilford]—has agreed to invest $24.25 million to acquire the reorganized railroad. P & W and CP argue, in essence, that we should not permit this investment because it might not prove profitable for [Guilford]. We believe that a clear indication of profitability and of long term

viability is the willingness of private investors to place their funds at risk in an enterprise. Approval of the Amended Plan is wholly consistent with *Milwaukee Road.* [Footnote omitted].

(I.C.C. Decision at 19–20).

A detailed narrative of the extensive rehabilitation of track and equipment problems of *Milwaukee Road,* and its traffic and financial hurdles, which required the attention of the Commission and resulted in the rejection by a unanimous Commission of two plans of reorganization and a plan of liquidation, is set forth in the 53-page decision in 363 I.C.C. 17 (1980). The court has examined all phases of that decision carefully, particularly the discussion of conditions establishing viability; it will serve no useful purpose here to enter upon a detailed dissertation on *Milwaukee Road.*[25] *Milwaukee Road* and B & M, as candidates for Commission approval of reorganization under Section 77, have little, if anything in common as to their over-all problems, and their respective proposals for providing means for the continued operation of manifestly disparate railroad systems. The Commission itself recognized important distinctions between the plan of reorganization in *Milwaukee Road* and that in B & M, and therefore the Commission, in its unanimous decision approving the B & M Trustees' Amended Plan, could and did conclude that: "[a]pproval of the [B & M] Amended Plan is wholly consistent with *Milwaukee Road".* *Id.* at 20. The court finds no basis for disagreement with that conclusion.

P & W's objection predicated on *Milwaukee Road* and *Railway Labor Executives' Assn. v. Gibbons,* 455 U.S. 457, 102 S.Ct. 1169, 71 L.Ed.2d 335, *rehearing denied,* 456 U.S. 939, 102 S.Ct. 1997, 72 L.Ed.2d 459 (1982) ("RLEA"), is entirely without merit. In the first place, the Commission's decision approving the Amended Plan proposed for B & M is not shown to be inconsistent, either in principle or in respect to any material fact, with the Commission's decision in *Milwaukee Road.* Moreover, no question as to the uniformity requirement of Article I, Section 8 (in the fourth clause) of the United States Constitution[26] arises when the Commission's decisions in *Milwaukee Road* and B & M are compared. Neither the uniformity clause of the Constitution nor the decision in *RLEA* constrains the Commission in the exercise of its statutory function when resolving the question whether a plan of reorganization should be approved.

After reviewing the objections of P & W, which, as above noted, the court assumed for the sake of argument were properly here, the court concludes that the objections should be and hereby are overruled.

**B**

Various state and local taxing authorities object that the Amended Plan makes no allowance for payment of interest on unpaid tax-lien claims up to the date of payment.

Claims for unpaid taxes constituting liens against the property of the Debtor, accrued before the petition for reorganization was filed, amount to approximately $640,000. The Amended Plan provides for payment in cash in the full amount of the principal of these claims, and the Trustees concede that interest thereon which accrued to the time of filing the petition on March 12, 1970 is payable on the claims. The plan will be modified to provide for such payment of interest. The objections of taxing authorities who seek post-petition interest on the pre-petition secured taxes will be discussed hereafter.

Claims for unpaid taxes likewise constituting liens, accrued during reorganization (March 12, 1970 through June 30, 1982), amount to $7.6 million. The Amended Plan

---

**25.** The court notes the caveat of Chairman Gaskins, concurring with a separate statement, that he was "concerned that this decision can be misconstrued in that it contains a wide spectrum of rate of return calculations ...". 363 I.C.C. 58 (1980).

**26.** The fourth clause of Article I, Section 8 of the United States Constitution provides that the Congress shall have Power

To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States;

provides for payment in cash in the full amount of these claims due and owing as of the date of consummation. The Trustees contend that no interest should be paid on these tax claims.

The question whether the Plan should provide for the payment of interest on unpaid taxes was not raised before the Commission; the question was raised before the court by numerous taxing authorities. At the court's suggestion the Trustees filed a petition seeking a determination as to the liability of the Debtor's estate for payment of interest on tax claims, and, after notice to all parties in interest, the court heard the petition on August 5, 1982. A motion was allowed by the court that the proceedings on the petition be incorporated in the record of the hearing on the question of approval of the Amended Plan.

 The evidence in the record establishes that during the period of reorganization sufficient cash has not been available to pay current taxes and all necessary current operating expenses indispensable to continued rail operation. Generally, post-petition local taxes are regarded as part of the cost of doing business in reorganization, but circumstances may arise when deferment by the court of tax payments is authorized. *See In re Penn Central Transportation Co.,* 325 F.Supp. 294 (E.D.Pa.1970), *affirmed,* 452 F.2d 1107 (3rd Cir.1971). In determining what allocation should be made of cash in the Debtor's estate, when the amount of such cash proves insufficient to meet all current obligations, paramount consideration must be given to the public interest in the continued operation of the railroad system in the cities and towns it serves. Here, payment of the taxes accrued during the reorganization was deferred by order of the court to keep the railroad in operation, and the delay in making prompt payment of the tax

obligations must be viewed as "a delay necessitated by law if the courts are properly to preserve and protect the estate for the benefit of all interests involved ...". *Vanston Bondholders Protective Com. v. Green,* 329 U.S. 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946).

 It has been a long-standing rule in bankruptcy and equity receiverships that accumulation of interest upon claims against the debtor stops when the petition is filed with the court. *Nicholas v. United States,* 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966); *City of New York v. Saper,* 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710 (1949); *Vanston Bondholders Protective Com. v. Green, supra; Sexton v. Dreyfus,* 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911); *Thomas v. Western Car Company,* 149 U.S. 95, 13 S.Ct. 824, 37 L.Ed. 663 (1893). *See United States v. Harrington,* 269 F.2d 719 (4th Cir.1959). In *City of New York v. Saper, supra,* the rule was made applicable to the accumulation of interest on tax obligations. *See Nicholas v. United States, supra* 384 U.S. at 682 & n. 10, 86 S.Ct. at 1679 & n. 10. The reasons advanced for the rule are that the time the petition is filed "fixed the moment when the affairs of the bankrupt are supposed to be wound up", *Sexton v. Dreyfus, supra* 219 U.S. at 344, 31 S.Ct. at 257, and that "creditors should not be disadvantaged *vis-a-vis* one another by legal delays attributable solely to the time-consuming procedures inherent in the administration of the bankruptcy laws" [footnote omitted]. *Nicholas v. United States, supra* at 683, 86 S.Ct. at 1679.[27]

The City of Cambridge (Cambridge) has the largest claim for unpaid post-petition tax liens (an amount now probably in excess of $3.5 million), and Cambridge contends that the Debtor will have sufficient

---

**27.** The following exceptions to the long-standing rule have been recognized: (1) where the bankrupt ultimately proves solvent, creditors have received post-petition interest before any surplus reverted to the debtor, (2) where securities held by a creditor as collateral produce income after the filing of the petition, such income has been applied to post-petition interest, and (3)

where the value of the security exceeds the principal of the claim plus interest to the date of payment, post-petition interest has been paid. *United States v. Harrington,* 269 F.2d 719, 724 (4th Cir.1959), views this third exception as "narrowly restricted" to "mortgagees or holders of other particular collateral" [footnote omitted].

resources "to pay all creditors in cash when the plan is confirmed, even if interest [probably in excess of $1.9 million in statutory interest] is allowed on [Cambridge's] tax claims". In light of the record in these proceedings on the question of approval of the Amended Plan, the court is not persuaded that Cambridge's vision of the future—full payment in cash to all creditors—is likely to be fulfilled. However, if it should come to pass, after all claims have been paid in full in cash, that there remains in the hands of the Debtor a surplus over and above what is required for the execution of the Amended Plan, then, in the view of the court, equitable considerations might permit payment of post-petition interest on such unpaid tax-lien claims of state and local taxing authorities. *Vanston Bondholders Protective Com. v. Green, supra,* 219 U.S. at 164, 67 S.Ct. at 240.

■ Cambridge further contends that it is entitled to receive interest on its post-petition secured tax claims before interest is allowed to the holders of the First Mortgage Bonds and the Income Bonds. To support its contention, Cambridge asserts that it relies upon the absolute priority rule of *North Pacific Ry. Co. v. Boyd, supra,* and *Case v. Los Angeles Lumber Products Company, supra.* Cambridge argues that by allowing interest to the bondholders, whose claims are at a lower priority, while denying allowance of interest on post-petition secured tax claims, the Amended Plan violates the absolute priority rule. The court disagrees.

Even though the Amended Plan provides for allowance of interest according to the terms of the bonds secured by the First Mortgage Indenture and the General Income Mortgage Indenture,[28] while it makes no allowance of interest on post-petition secured tax claims, the Plan is not objec-

tionable. *In re New York, New Haven and Hartford Railroad Co.,* 304 F.Supp. 1121, 1133–34 (1969). *See United States v. Harrington, supra* at 724, and *State of New York v. Feinberg,* 204 F.2d 502, 503 (2d Cir.1953). *In Harrington, supra,* the court succinctly stated the rationale for the distinction drawn between mortgagees and secured tax claims in the allowance of post-petition interest: "The justification for this allowance to mortgagees, etc., would seem to be that when the creditor extended credit, he relied upon the particular security given as collateral to secure both the principal of the debt and interest until payment and, if the collateral is sufficient to pay him, the contract between the parties ought not be abrogated by bankruptcy. This rationale has no application to tax liens [footnote omitted]." *Id.* at 724. There is nothing in *Fosdick v. Schall,* 99 U.S. 235, 9 Otto 235, 25 L.Ed. 339 (1878), or *In re Boston and Maine Corporation,* 634 F.2d 1359 (1st Cir.1980), *cert. denied,* 450 U.S. 982, 101 S.Ct. 1518, 67 L.Ed.2d 817 (1981), or *Southern Railway Company v. United States,* 306 F.2d 119 (5th Cir.1962), relied upon by Cambridge, that is inconsistent with denying interest on secured tax claims while allowing payment of interest according to the terms of the mortgage bonds. The court finds that the Amended Plan does not violate the absolute priority rule in denying allowance of interest on post-petition secured tax claims.

■ *Vanston* counseled that "the touchstone of each decision on allowance of interest in ... reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor". 329 U.S. at 165, 67 S.Ct. at 241. Should post-petition interest be allowed on either pre-petition or post-petition secured

---

**28.** The Amended Plan, in sections 3.4, 3.5, and 3.7, effectively provides for allowance of interest (including "interim interest") accruing, until the Consummation Date, on the debts represented by the First Mortgage Bonds and the Income Bonds. Under the terms of sections 3.4 and 3.7, the holders of the First Mortgage Bonds are entitled to receive interest at an annual rate of 6%. And under the terms of sections 3.5 and 3.7, the holders of the Income Bonds are enti-

tled to receive interest at an annual rate of 4%. According to the Trustees' Updated Version to June 30, 1982, filed August 6, 1982, of the Trustees' response to Order No. 675: (1) the aggregate interest accrued, as of June 30, 1982, on the First Mortgage Bonds amounted to $7,710,024; and (2) the aggregate interest accrued, as of June 30, 1982, on the Income Bonds amounted to $18,449,500.

tax claims here, until payment of the principal, the delay in making prompt payment of the taxes—a delay necessitated by law to keep the railroad running—would diminish the distributive shares of general creditors through no fault of theirs, and would have the effect of penalizing them. Under such circumstances, allowance of post-petition interest claimed by the taxing authorities here would not be in accord with equitable principles. *Vanston, supra* at 163–65, 67 S.Ct. at 240–41; *United States v. Harrington, supra* at 721–24.

While post-petition secured taxes are part of the cost of doing business during the reorganization, and, accordingly, are entitled to the same priority as administration expenses, such taxes do not enjoy a rank higher than that of other administration expenses. Presumptively, all administration creditors should be treated alike. In any event, the fact that post-petition secured tax claimants are entitled to the priority of administration creditors, does not entitle them to allowance of interest until paid.

The provisions of the Amended Plan are not objectionable for failure to make allowance for payment of post-petition interest, to date of payment, on either pre-petition taxes or post-petition taxes. *In re New York, New Haven and Hartford Railroad Co., supra* at 1134; *In re Penn Central Transportation Co., supra* at 298ff.

The Town of Madbury, New Hampshire ("Madbury") filed an objection to the Amended Plan for failure of the Plan to provide for allowance of post-petition interest to date of payment of its tax-lien claim. Madbury points to the undisputed facts, apparently distinctive to its claim, that the real estate that secured its tax lien was sold in 1974 for a price well above the assessed value, and that since 1974 the Debtor has had the benefit of the substantial interest income on the proceeds. On the basis of these facts, Madbury argues that the court should exercise its equitable discretion to allow Madbury's interest claim, even if the court does not allow the outstanding post-petition interest claims of other taxing authorities.

The City of Keene, New Hampshire ("Keene") filed objection to the Amended Plan for failure of the Plan to provide for allowance of interest on its tax claim. Keene also calls attention to circumstances, which it asserts are peculiar to its claim, that warrant exercise of the equitable discretion of the court to allow post-petition interest on Keene's unpaid taxes. Keene asserts that although the Debtor has owned real estate in Keene, some of which was used in the ordinary business of the railroad and some of which was not, during the reorganization period, Keene has received "nothing but decreasing railroad service" from the Debtor. Therefore, Keene argues, the court should view the distinctive equities in Keene's claim as weighing in the balance in Keene's favor.

After a careful review of the undisputed facts, and the assertions and arguments advanced by Madbury and Keene, respectively, the court finds that the delay in making prompt payment of their tax claims was "necessitated by law" to keep the railroad running. While the circumstances and details of Madbury's and Keene's claims distinguish their claims somewhat from the interest claims of others, nevertheless, in the "balance of equities between creditor and creditor" it would not be equitable for either Madbury or Keene to gain an advantage over others because of the act of the law in the delay in distribution of the assets of the Debtor's estate to all entitled to them under the Amended Plan.

After review of the objections filed by the taxing authorities, the court concludes that the Amended Plan providing (1) payment in cash in the full amount of pre-petition secured taxes, and interest thereon from the date of default until March 12, 1970, at the rate of interest payable during the period of default, (2) payment in cash in the full amount of post-petition taxes, and (3) no payment of post-petition interest to date of payment of the tax on either pre-petition taxes or post-petition taxes, is not objectionable. The court concludes further

that the objections should be and hereby are overruled, and their claims are hereby denied.

## C

Certain holders of unsecured claims, who assert entitlement to priority under the Six Months rule, have objected to the Amended Plan for its failure to provide for allowance of interest on their pre-petition claims. The group of claimants raising the objection includes the Chessie system,[29] CP, Penn Central, and the Committee of Interline Railroads. In seeking allowance of interest, these claimants rely on Order No. 637 of the court and on the decision in *Boston and Maine, supra.* Furthermore, the claimants argue that standards of fairness and equity require that the Amended Plan provide for allowance of interest on their claims.

As mentioned above at 946, Order No. 637 established a separate classification of general unsecured creditors. Pursuant to Section 77(b) [11 U.S.C. § 205(b)][30] of the Bankruptcy Act, and in accordance with the principles in *Boston and Maine, supra,* Order No. 637 provides as follows:

The holders of general unsecured claims against the Debtor, timely filed and duly proved in this matter and allowed by the court, where each claim meets these requirements: (a) it was incurred within six months before the filing of the petition for reorganization on March 12, 1970, (b) it was for an expense necessarily incurred for the purchase of goods or services used in the current operations of the railroad, and (c) the goods or services were delivered on credit in the expectation they would be paid for out of current operating revenues of the railroad and not in reliance on the railroad's general credit.

Payment of claims of this class shall be on the same basis and from the same

operating income as administration claims of operating expense creditors.

As appears above at 941, the principal amount of each allowed Six Months claim will be paid in full in cash on the Consummation Date.

■■■■ It is clear that neither Order No. 637 nor the decision of the First Circuit in *Boston and Maine, supra,* supports the interest claims. The question of entitlement to interest was not considered by the Court of Appeals, nor was it considered by this court. Interest does not necessarily accumulate on unsecured claims that qualify for the Six Months priority. The general rule against permitting accumulation of interest upon claims against the debtor after the filing of the petition is applicable to Six Months claims, and here no showing has been made that these claims fall within any of the exceptions to the rule. The court concludes that as general unsecured creditors, the holders of Six Months claims are not entitled to post-petition interest.

■■■ The Six Months claimants also assert entitlement to interest that accrued on these underlying claims before the petition was filed on March 12, 1970. In *Debentureholders, etc. v. Continental Inv. Corp.,* 679 F.2d 264, 268 (1st Cir.1982), cert. denied, 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1983), the court pointed out that "[p]re-petition interest is governed by state law, absent an overruling federal law". *Cf. Vanston Bondholders Protective Com. v. Green, supra* 329 U.S. at 161–70, 67 S.Ct. at 239–44. The applicable law in Massachusetts was summarized in *Debentureholders, supra:*

State law may allow pre-petition interest either because the parties have so contracted or because under state rules governing contracts a person who breaks a contract for a liquidated sum must pay

---

**29.** Chesapeake and Ohio Railway Company, Baltimore and Ohio Railroad Company, and Western Maryland Railway.

**30.** The statute provides: "For all purposes of this section unsecured claims, which would have been entitled to priority if a receiver in

equity of the property of the debtor had been appointed by a Federal court on the day of the approval of the petition, shall be entitled to such priority and the holders of such claims shall be treated as a separate class or classes of creditors."

as part of the damages interest from the date of the breach. [Citations omitted]. 679 F.2d at 268. None of the Six Months creditors claiming pre-petition interest here has presented evidence, or has argued, that the claim for interest arises out of the terms of a contract providing for payment of interest. Nor has there been any showing made of a basis in "overruling federal law" that would support allowance of pre-petition interest claims.

■ The court is not persuaded that considerations of fairness and equity support the allowance of interest on these Six Months claims. "A reorganization court must consider the issue of post-petition interest not in the abstract, but in light of the nature of each claim, and in application of basic principles of fairness and equity." *In re Penn Central Transportation Company*, 358 F.Supp. 154, 170 (E.D.Pa.1973). It must not be overlooked here that under the Amended Plan each Six Months creditor will receive in cash the full amount of principal of his allowed pre-petition unsecured claim while all other general unsecured creditors will receive only Series D CCIs equal to ten percent of their respective liquidated and allowed claims. Moreover, under the Amended Plan these Series D CCIs will be redeemed in cash *only* if and when cash is determined to be available in accordance with section 3.1(2) of the Plan, as amended. To allow interest on the claims of the Six Months creditors until payment of the principal would be to penalize other creditors because of a delay necessitated by law. *Cf. United States v. Harrington, supra* at 723, and *Vanston Bondholders Protective Com. v. Green, supra* 329 U.S. at 163, 67 S.Ct. at 240. The allowance of interest under such circumstances would not be in accord with equitable principles.

The court concludes that the objections of the Six Months creditors to the Amended Plan for failure to provide allowance of post-petition interest on the allowed claims should be and hereby are overruled, and their claims for interest are hereby denied.

D

■ Written objections to the Amended Plan were filed by two stockholders—one holding shares of the presently outstanding common stock; the other holding shares of both outstanding preferred and outstanding common stock—who seek equitable treatment for failure of the Plan to make provision for a distribution to them of part of the Debtor's assets. As explained earlier in this opinion, the Commission found that the equity in the shares of the preferred and common stock has no value, and the court has affirmed that finding. As a general proposition, a plan of reorganization cannot provide for a stockholder's participation in the reorganization unless the plan provides full compensation to unsecured creditors for their rights discharged pursuant to the plan. Although the result is unfortunate, the court must reaffirm here the Commission's finding in view of the value of the Debtor's property for purpose of reorganization and the application of the absolute priority rule. The court concludes that the objections of the two stockholders should be and hereby are overruled, and their claims are hereby denied.

VII

Under the Commission's order approving the Amended Plan and certifying it to the court, it is stated that "[t]he construction of the Amended Plan by the court, whether before or after the submission of it to creditors, is final and conclusive. The court shall have the power to cure any defect, supply any omission, or reconcile any inconsistency in such manner and to such extent as may be necessary or expedient in order to carry out the plan effectively". (I.C.C. Decision at 60). For the purpose of clarifying and making effective the provisions of the Amended Plan, the following modifications of the Amended Plan, which will not require its reference to the Commission, should be made:

A. The sentence in section 4.3 of the Amended Plan ("Rejection of ... Executory Contracts") shall be modi-

fied by striking out the period at the end of the sentence, and by substituting therefor a comma, and by adding to the sentence the following: "and the Trustees shall give notice to each party to a contract to be rejected of such rejection by mailing notice of such action pursuant to the order of the court."

B. The sentence in section 3.11 of the Amended Plan ("Issuance of New Common Stock") shall be modified to read as follows: "As of the Consummation Date, the First Mortgage Bonds and the Income Bonds registered in the name of Guilford pursuant to sections 3.4 and 3.5 above shall be transferred to the Trustees, and the bonds shall thereupon be cancelled by the Trustees, and the reorganized Company shall issue to Guilford, and Guilford shall become the sole owner of 2,425,000 shares of Common Stock, which shares shall constitute all of the outstanding Common Stock of the Reorganized Company."

C. The part of the sentence in section 3.3(1) ("Segregated Account"), commencing in subsection (ii), shall be modified by adding at the end of subsection (ii) the following: "such amount of cash or cash equivalents of the Debtor in Account No. 703 ("Special Deposits"), as of the Consummation Date, as represents the proceeds of the Reading Line Interest Settlement; and"

D. The last sentence in section 2.2 of the Amended Plan, commencing "Effective as of the Consummation Date", shall be modified to read as follows: "Effective as of the Consummation Date, the reorganized Company shall thereupon and thereafter be responsible for all Administration Claims, if any, which are not satisfied in full prior to the Consummation Date, and the Trustees shall have no further responsibility relating to the Debtor or to the conduct of its affairs; provided, however, that the Trustees shall continue to serve as such for the limited purposes of administering and making payments from the Segregated Account, as provided in Article III below, and implementing the New Plan, as provided in section 4.4 below; and provided further that any compensation payable to the Trustees for such services after the Consummation Date shall be in such amounts as the Reorganization Court may approve as being appropriate and shall be paid solely from the Segregated Account."

The court determines that it is necessary to clarify the provisions of section 4.3, relating to the rejection of executory contracts, because the section, as it read before the modification, appeared to authorize rejection of executory contracts without notice of such rejection to the other contracting party. The modification makes it clear that such notice is required by the Amended Plan.

The principal purpose for modifying section 3.11 of the Amended Plan is to provide for cancellation of the First Mortgage Bonds and the Income Bonds after payment to the bondholders has been effected pursuant to sections 3.4, 3.5, and 3.7 of the Amended Plan. Although section 4.5 of the Amended Plan is entitled "Cancellation of Securities, Etc.", no provision is made therein, or elsewhere in the Amended Plan, for cancellation of either the First Mortgage Bonds or the Income Bonds. It is clear that the Amended Plan considered as a whole contemplates that the First Mortgage Bonds and the Income Bonds shall be paid in full on the Consummation Date, and that the Debtor's liability thereon shall be discharged. Explicit provisions requiring cancellation of the bonds by the Trustees on the Consummation Date will confirm that construction of the Plan.

On October 13, 1982 the court determined that the $2.0 million paid by MBTA to the Trustees in settlement of the Debtor's claim for interest on an arbitration award in favor of the Debtor, arising out of the Reading Line Taking, so called, were

not restricted funds in the hands of the Trustees. It was the court's opinion that those "funds and all increments thereto should be held by the Trustees pending further action on the Amended Plan". The foregoing rulings appear in the court's Memorandum filed October 13. The modification of section 3.3(1) makes clear that the proceeds of the Reading Line Interest Settlement should no longer be held by the Trustees as restricted funds, but should be held for deposit in the Segregated Account.

The court determines that it is necessary to clarify the provisions of section 2.2, by striking certain language therefrom, in order to avoid possible conflict with sections 4.4 ("Implementation of New Plan") and 4.6 ("Reservation of Jurisdiction") concerning the powers, duties and immunities of the Trustees on the Consummation Date and thereafter. In the court's opinion, such powers, duties and immunities of the Trustees will be more appropriately defined and described in the Consummation Order.

Upon full consideration of the record of proceedings before the Commission on the Amended Plan, including the verified statements of witnesses, the transcripts of testimony, and the proceedings before the court, the court is satisfied that the relevant findings and conclusions of the Commission on the Amended Plan as certified to the court, are adequately supported by material evidence and agree with legal standards.

Further, the court is satisfied that the Amended Plan, as modified

(a) complies with the provisions of Section 77(b), and (e) as amended, of the Bankruptcy Act [11 U.S.C. § 205(b) and (e) ];

(b) is fair and equitable and affords due recognition to the rights of each class of creditors and stockholders;

(c) does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders;

(d) makes adequate provision for payment of all costs of administration and all other allowances made or to be made by the court;

(e) makes adequate provision for payment of expenses and allowances incident to the reorganization, including compensation and reimbursement of expenses, within such maximum limits as are fixed by the Commission to be subject to the approval of the court, as provided in Section 77(c)(12) [11 U.S.C. § 205(c)(12) ] (the amount reserved in the Amended Plan for all such purposes is in excess of the total amount of claims for payment which can reasonably be anticipated);

(f) is feasible, and is compatible with the public interest.

To summarize briefly, the court concludes that all of the statutory prerequisites to approval have been met, and that the Amended Plan, as modified for the purpose of clarifying and making effective its provisions, will be approved. Furthermore, all objections to the Amended Plan are hereby overruled, and all fees and expenses within such maximum limits as are fixed by the Commission subject to the approval of the court will be ordered paid.

## VIII

The B & M was a comparatively small railroad when the petition for reorganization was filed. At that time the railroad was badly run down and in need of substantial capital investment and improvement. From the inception of reorganization the Trustees have made good progress in cutting costs, restoring the level of service on the railroad, retaining the confidence of its customers, and proceeding toward reorganization. The Trustees, their counsel, B & M management and employees, all have devoted many years of hard work to the struggle to achieve reorganization, and much credit is due to them for bending their efforts and skills toward reaching that goal. Much credit is also due to other parties, with vital interests in the Debtor's estate, for their patient coopera-

960

tion during the reorganization process. The B & M still is a comparatively small railroad, but manifestly a much healthier one.

Accordingly, in consideration of the foregoing, it is hereby ORDERED:

(1) The Amended Plan as modified is hereby *Approved.*

(2) The final date for mailing written acceptances or rejections of the Amended Plan is March 30, 1983.

(3) Voting on the Amended Plan shall be governed by the provisions of the Voting Procedure on Plan of Reorganization, Order No. 709, entered this date.

(4) A certified copy of this opinion and order shall be sent to the Commission.

**In the Matter of BOSTON AND MAINE CORPORATION, Debtor.**

**No. 70–250–M.**

United States District Court, D. Massachusetts.

May 10, 1983.

See also D.C., 46 B.R. 927.